**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1533-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

NELSON VARGAS,

     Defendant-Appellant.

_____

Submitted December 2, 2025 – Decided April 10, 2026

Before Judges Susswein, Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-01-0078.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Ruth E. Hunter, Designated Counsel, on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Lauren Haberstroh, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Nelson Vargas challenges his convictions for murder, attempted murder, and other offenses stemming from a May 15, 2017, drive-by shooting in Passaic that resulted in the death of Hansel Castillo and the wounding of Bryan Cabrera. The State alleged that defendant drove the car involved in the shooting, and that codefendant, Christopher Reynoso,[1] was his passenger. The State's case included witness descriptions of the car and its license plate, which were similar to the appearance and plate of a car defendant was seen driving at a nearby gas station shortly before the shooting; detectives' stationhouse interrogation of Reynoso, a recording of which was played for the jury; and a police officer's identification of Reynoso as a person wearing similar pants to those worn by the second person in that car. Surveillance video showed this car, or one very similar to it, driving in the area of the shooting just before and after the attack. However, there was no video depicting the shooting itself,

---

[1] Codefendant Reynoso challenges his convictions in a separate appeal, State v. Reynoso, __ N.J. Super. __ (App. Div. 2026), on which we heard oral argument. In that appeal, we focus on Reynoso's Miranda and self-incrimination contentions arising from his stationhouse interrogation—issues that defendant cannot raise. See Miranda v. Arizona, 384 U.S. 436 (1966); State v. Baum, 199 N.J. 407, 417 (2009) (holding that a defendant cannot "vicariously assert that another's right against self-incrimination has been violated" under either the federal or New Jersey constitutions). We therefore issue separate opinions.

no eyewitnesses identified either defendant, and there was no forensic evidence linking defendants to the crime.

At trial, defendants argued that they had no connection to the victims and no motive for the shooting. They asserted a third-party guilt defense, arguing that another duo investigated by police, Patrick Torlao and Mehdi Hadjiedj, were the more likely perpetrators. Torlao and Hadjiedj were involved in an altercation with unknown men in the area involving the theft of Torlao's car two months before the shooting. Police ruled them out as suspects after both provided alibis. The State presented their testimony and testimony of officers who investigated Torlao and Hadjiedj in order to discredit defendants' third-party guilt theory.

On appeal, defendant raises numerous trial errors. He argues that the court improperly failed to redact statements and questions by officers during the recorded interrogation of Reynoso that allude to defendant and express the officers' belief that Reynoso and defendant were involved in the shooting. Defendant contends that the interrogation should have been further redacted and that any mention of him should have been removed.

Defendant additionally argues that the trial court erred by allowing an officer to testify that video footage from a local music studio—which was not

A-1533-22

preserved and thus not entered into evidence—confirmed Hadjiedj's alibi. He asserts that the court should have issued an adverse inference instruction regarding the State's failure to preserve the video. Defendant also contends that the court erred by not sua sponte issuing a specific instruction on third-party guilt, and by not granting his motion for acquittal following the close of the State's case.

Defendant further argues that the prosecutor committed misconduct during summation by asserting that Reynoso was holding a gun in defendant's car at the gas station and by improperly vouching for police officers' testimony. He also asserts that his sentence is excessive, and that the trial court failed to explain the overall fairness of its imposition of consecutive sentences for the murder of Castillo and attempted murder of Cabrera.

After reviewing the record in light of the governing legal principles, we affirm defendant's convictions and sentence.

I.

We discern the following facts and procedural history from the record.

## A. The Incident

This case stems from a May 15, 2017, drive-by shooting of several people gathered in front of a residence on Federal Street in Passaic. At 11:15 p.m. that

night, a car drove past the residence before turning right onto Burgess Street at 11:16 p.m. The car then circled back onto Federal at 11:18 p.m. and passed the home again. On this second pass, someone fired a gun from the car at a group of people gathered in front of the residence, hitting twenty-year-old Bryan Cabrera and twenty-three-year-old Hansel Castillo.

At approximately 11:21 p.m., several officers from the Passaic Police Department (Passaic PD) were dispatched to the scene on a report of shots fired. The Passaic PD recovered four spent shell casings and a live round from a .22-caliber semiautomatic handgun on the roadway in front of the home.

Cabrera was transported to St. Joseph's Hospital in Paterson for treatment of a gunshot wound to his shoulder; he was discharged at approximately 2:00 a.m. on May 16. Castillo, who had been hit in the right side of his chest, was taken by a friend to St. Mary's Hospital in Passaic.

Passaic PD Detective Michele Merced, the lead investigator of the shooting, spoke with Castillo at the hospital at around 11:25 p.m. on May 15. Initially, Castillo did not want to talk to the police, but Merced told him, "he might want to talk to [her] because he might die." In critical condition and struggling to breathe, Castillo told Merced he had been shot by two men in a

5

four-door gray Nissan Maxima, although he did not identify them. Castillo succumbed to his wounds the next morning.

## B. The Investigation

After speaking with Castillo, Merced talked to other witnesses who had gathered at St. Mary's. Witnesses consistently reported that the vehicle from which the shots were fired was a Nissan, although they differed on the specific model and color; some said it was gray, while others said it was silver, beige, or gold, and it was variously described as an Ultima or a Maxima. Some witnesses described the car as two-toned, with a black hood.

One of Castillo's friends, sixteen-year-old Wilmer Avelino, was interviewed by the Passaic PD in the early morning hours of May 16.[2] He lived at the Federal Street residence and told Merced he saw the shooter's vehicle pass his home once before the incident. Avelino reported that the car came around

---

[2] At trial, Avelino testified that he could not remember anything about the incident or his statement to Merced, even after viewing a recording of his interview prior to taking the stand. A hearing was held outside the jury's presence during which the recording was played for Avelino again. He averred that he still could not recall what he said and was unsure if it was even him in the video, because he suffered from a memory-related medical condition. Analyzing factors set forth in State v. Gross, 216 N.J. Super. 98, 109-10 (App. Div. 1987), the court concluded that Avelino's claim of memory loss was specious and that the interview video could be admitted as substantive evidence and played for the jury.

the block again "right away," and that he heard three or four gunshots as it passed his home again.

Avelino took note of the car because the first time it passed, it stopped in front of the residence, and the occupants appeared to look around. Avelino described the vehicle as a gray Nissan with bright headlights and said the passenger side of the vehicle was the side facing his home. Avelino described the driver of the car as "tall," but said he could not see the passenger clearly because his view was obscured by another vehicle.

At first, Avelino said the car had a New Jersey license plate and that he "saw a Z." He thought it was the first letter on the plate, and said again, "[T]hat's all I saw was the Z, because, like, it was so fast." When Merced asked if he was "sure" it was a Z, Avelino said, "It was a Z or an S, something like that." Merced admitted on cross-examination that her notes concerning the interview said only that the plate number began with a "Z," and did not mention an "S." Avelino told Merced he did not know of anyone who "had a beef" with any of the individuals outside the Federal Street residence that night, and that the incident seemed "random" to him.

The Passaic PD collected surveillance footage from several nearby addresses via warrants; video clips and still images from these cameras were

compiled into a single video approximately thirty-eight minutes and twenty seconds long. Although none of the footage depicted the actual shooting or the Federal Street residence itself, the State argued it showed a car turning right from Federal Street onto Burgess Place at 11:16 p.m. and again at 11:20 p.m. on the night of the incident. Other, earlier videos showed what appeared to be the same car traveling from a nearby residence on Howe Avenue at approximately 10:54 p.m. to a gas station on Main Avenue, where it arrived at 11:04 p.m. This vehicle left the gas station at approximately 11:07 p.m., drove the short distance to Federal Street, circled the block, and then returned to the Howe Avenue residence, arriving there at 11:27 p.m. The video showed two people exiting the vehicle and going into the house, then returning about fifteen minutes later and appearing to search the front passenger seat area of the car.

Detective Raymond Rodriguez testified that he received information relating to the Facebook profile of "Grandee" or "Grande" Vargas that was relevant to the investigation. On May 19, 2017, he informed Merced, who found the Facebook account and learned that its owner was defendant. Merced obtained defendant's driver's license photo and shared it with other officers.

On May 20, Passaic County Prosecutor's Office Detective David Posada conducted a search of two automated license plate reader (ALPR) databases.

A-1533-22

Posada's ALPR searches centered on the Federal Street residence and returned scans of approximately 4,300 license plates. One of those results was for a beige Nissan with a license plate beginning with a Z and a black hood. This car had been captured by the ALPRs at the intersection of Federal and Burgess twice on May 11, a few days before the shooting, and parked on Howe on May 16, the day after the shooting.

Posada learned that the registered owner of the Nissan was Robert Guzman and interviewed him on May 22. Officers accompanied Guzman to his home, also on Howe Avenue, where he gave them the license plates from the car. Posada testified that Guzman had obtained the license plates the day after the shooting. Police determined there was no evidence linking Guzman to the homicide, and he was not arrested.

On May 23, officers executed a search warrant at the Howe Avenue residence. They recovered a hard drive that contained video footage depicting defendant and Reynoso at the house but could not determine the date or time of the footage, and it contained no evidence "regarding . . . the homicide." Police also recovered a New Jersey registration and insurance card for a Nissan bearing a plate beginning with Z, and a driver's license exam permit issued to defendant.

A-1533-22

Merced reviewed all the surveillance footage collected during the investigation, alongside defendant's driver's license photo. On May 24, Merced decided to charge defendant related to the shooting. Defendant turned himself in to the Passaic PD on June 1.

The surveillance footage the Passaic PD collected from May 15 also included a video showing individuals gathered on the street a few houses down from the Howe Avenue residence from approximately 6:50 p.m. to 7:15 p.m., when an ice cream truck arrived. At trial, Rodriguez identified Reynoso as an individual wearing two-toned pants in this video. Rodriguez said he recognized Reynoso as a participant in a Junior Police Academy program when Reynoso was ten or eleven years old,[3] and also described interactions the two had at a laundromat in Passaic. Rodriguez said that when he viewed the ice cream truck video, he recalled that the person in the two-toned pants was "Christopher, or Chris," and relayed that information to Merced.

Reynoso was flagged by the Passaic PD as a person of interest after the execution of the search warrant at the Howe Avenue residence and Rodriguez and Merced's review of the surveillance video from the camera a few houses away. On June 1, Reynoso was interviewed with his mother present by

_____

[3] Reynoso was nearly eighteen years old at the time the shooting occurred.

Rodriguez, Detective Alex Flores, and Detective Katie Velarde. During this interview, Reynoso stated that he was wearing two-toned gray and blue pants on May 15. A pair of sweatpants matching this description was recovered during a search of Reynoso's residence with his mother's consent.

However, when the officers confronted him during the interview with the surveillance videos from the ice-cream truck, gas station, and outside the Howe Avenue residence, Reynoso denied appearing in the footage. He said he spent the night of May 15 with friends, including defendant, inside the Howe Avenue residence. Reynoso said he smoked marijuana and took a Percocet pill. Throughout repeated questioning, Reynoso maintained that he had "passed out" at the Howe Avenue house by 10:00 or 10:30 p.m. and did not go anywhere in a car. When asked about the homicide, Reynoso said, "[t]hat kid died supposedly, uh, for stealing cars or car pieces." Reynoso was arrested in connection with the shooting toward the end of his interrogation.

At trial, the State argued that defendant drove the Nissan with the "Z" license plate allegedly depicted in the surveillance footage, and that Reynoso was the passenger who fired the gun. The prosecutor urged the jury to "look at the pants and examine the pants" to determine who was in the videos.

A-1533-22

## C. Torlao and Hadjiedj

At an early stage of the investigation of the shooting, the Passaic PD considered Patrick Torlao and Mehdi Hadjiedj as potential suspects. Police learned that on March 18, 2017, Torlao notified the Jersey City Police Department that a car he had recently purchased from a seller in Passaic, Daniel Sierra, had been stolen. He also told his friend Hadjiedj about the theft, and the two posted on social media requesting information about the stolen vehicle.

Hadjiedj received an anonymous message in response to a Facebook post he made, advising him that Torlao's car had been seen in the driveway of a Highland Avenue residence in Passaic. On March 19, 2017, Torlao and Hadjiedj drove to that residence and saw Torlao's car beneath a tarp, being stripped by a group of men. When Hadjiedj turned around to pass the house again, these men got into a car and fled. Hadjiedj pursued for a short distance, but then the two returned to the house and called the Passaic PD. While waiting for police to arrive, Torlao found a valet key in the ignition of his vehicle which Sierra, the seller, had not told him about.[4]

---

[4] Rodriguez testified at trial that based on this information, the Passaic PD felt that Sierra or someone associated with him had stolen the green Honda back from Torlao. Posada and Merced interviewed Sierra and determined that he was not involved with the homicide.

Torlao and Hadjiedj were approached by a group of people who told them to "get the f[**]k out of [t]here." Torlao told them they would not leave without his car. The group "[went] back and forth" with Torlao and Hadjiedj and at one point one of the men "brandish[ed]" a firearm. They left after Hadjiedj said police were on the way. Officers arrived about twenty minutes later and took statements from the two men; neither mentioned a gun to police.

About a week later, Torlao and four of his friends, not including Hadjiedj, returned to Passaic in two cars to find and confront anyone involved with the theft. Torlao testified that he was not armed and that he believed his companions had no weapons either. He drove past the block where his car was recovered, but saw no one there. The two carloads of friends stopped at a nearby business, where a car pulled up, rolled down its windows, and then continued driving. Believing that the people inside "might have had something to do with the stolen car," Torlao followed this vehicle, but passed it when it pulled over. He said the group heard what they believed to be gunshots and drove back to Jersey City without further incident. On cross-examination, Torlao admitted he was "angry" and that if he had recognized any of the people involved with the theft during this trip, he had planned "a physical altercation at that point."

13

On May 16, 2017, Rodriguez and two other Passaic PD officers traveled to Jersey City to speak with Torlao about the shooting in this case, which took place just around the corner from the Highland Avenue residence where Torlao's car was found. Torlao, who assumed police wanted to talk about his car, was brought back to Passaic PD headquarters and interviewed by Rodriguez and Posada at 11:22 p.m. that day. Rodriguez testified that during the three-hour interview, Torlao was "open" with the detectives and displayed a "relaxed [and] calm" demeanor.

Torlao said at trial that because he did not know at first that he would be questioned about a homicide, he did not initially tell the detectives about his second trip to Passaic with his friends. However, once the detectives revealed that he was suspected of being involved in the Federal Street shooting, he told them about his actions. Rodriguez and Posada both acknowledged that Torlao "changed his story" and "lied" in that respect.

Torlao told police, and later testified at trial, that he was sleeping at home with his mother on the night of May 15, 2017. Rodriguez, Posada, and Merced testified that the Passaic PD did not contact Torlao's mother to confirm this or obtain any other evidence like cell phone data to corroborate his location. After the interview, the Passaic PD decided not to charge Torlao in connection with

14

the shooting because they determined there was "no evidence to support that [he] had anything to do with the homicide."

The Passaic PD also interviewed Hadjiedj in the early morning hours of May 17, 2017. Hadjiedj, a rapper, told Merced and Flores that he was with four or five friends at a music studio in Clifton on the night of May 15. He said a typical studio session lasted three to four hours, and that he was at the studio for around that length of time. Hadjiedj told the detectives he had nothing to do with any homicide and knew nothing about the shooting on May 15.

Hadjiedj gave the detectives the names and phone numbers of four friends he said were with him at the studio. Police called them promptly, in the middle of the night, and two did not answer. The third answered but said he was not at the studio that night; Hadjiedj suggested at trial that this man "made up a lie" because he did not know why the police were calling him. The fourth friend, referred to as "Kemo" or "Chemo," asked to hear Hadjiedj's voice to verify that it was really police officers calling him, and then corroborated Hadjiedj's whereabouts.

At around 7:00 p.m. on May 18, 2017, after reviewing a picture of Hadjiedj, Rodriguez, and Flores visited the music studio to further investigate Hadjiedj's alibi. The detectives spoke with an employee of the studio and

reviewed several hours of surveillance footage from the night of May 15 on a studio computer. According to Rodriguez, the studio employee did not know how to operate the recording software that captured this footage, and he and Flores were unable to make a copy of it or otherwise preserve it. He said he tried, but "[f]or some reason, the system wouldn't allow [him] to do that." Flores also said Rodriguez "tried" to download the video, saying he did not "remember why it wasn't loading, but it just didn't load." The record does not indicate that Rodriguez or Flores attempted to copy or preserve the footage by other means, such as by recording it with their cell phone cameras.

Over defendants' objections, Rodriguez and Flores testified that the surveillance video showed Hadjiedj arriving at the studio at 9:35 p.m. on May 15, 2017, listening to music and smoking a hookah with five or six others, and departing at 12:50 a.m. on May 16. Rodriguez said Hadjiedj did not leave the area at any point during the surveillance video. Rodriguez informed Merced about the video's contents after leaving the studio.

During his statement to police, Hadjiedj also told officers that his father, Mohammed Hadjiedj, owned a Nissan, but that it was black. When officers showed Hadjiedj a list of vehicles registered to his father, he confirmed all the entries except for a gray or silver 2002 Nissan, which he said no one in his family

16

had ever owned. At trial, he reiterated that no one in his family owned or drove such a car.

Posada conducted a search of Motor Vehicle Commission data and other databases and learned that a 2002 gray Nissan Maxima with a license plate number containing no Z's or S's was registered to Mohammed Hadjiedj. Posada conducted a county-wide ALPR search for this plate number for the period from January to May of 2017, which returned no hits. Posada then performed a statewide search, which yielded sixteen hits for the plate number, all in Jersey City. Based on this information, Posada and Merced reasoned that Mohammed Hadjiedj's Nissan was not the shooter's vehicle. Hadjiedj was never arrested or charged in relation to the shooting.

At trial, defendants extensively cross-examined Torlao, Hadjiedj, and investigators, and argued that it was more likely that these two committed the charged crimes out of anger over the stolen car.

### D. Trial and Sentencing

On January 19, 2018, defendants were charged by indictment with murder, N.J.S.A. 2C:11-3(a)(1) and (2); attempted murder, N.J.S.A. 2C:5-1(a)(1) and N.J.S.A. 2C:11-3(a)(1); conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3; two counts of possession of a weapon for an unlawful

purpose, N.J.S.A. 2C:39-4(a); and unlawful possession of a handgun, N.J.S.A. 2C:39-5(b).

On February 11, 2020, following a multi-day hearing, the trial court granted Reynoso's motion to suppress his statement to police in part, and denied it in part. On February 25, 2020, the court denied defendant's motion to sever the trial.

The first trial was convened in March 2020. It ended in a mistrial because of the COVID-19 pandemic. A new trial was held over the course of seventeen non-consecutive days in May and June 2022. On May 13, 2022, the court denied defendants' motion to preclude testimony by Detective Rodriguez about the music studio surveillance video or alternatively for an adverse inference charge based on the State's failure to preserve it. On June 13, the jury found defendants guilty on all counts.

On December 16, 2022, the trial court denied defendants' motion for a new trial. It then sentenced Reynoso to thirty-five years for murder, with a thirty-year period of parole ineligibility, and a consecutive term of fifteen years for attempted murder, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. It sentenced defendant to forty years subject to NERA for murder

A-1533-22

and a consecutive term of fifteen years subject to NERA for attempted murder. All other charges merged or were run concurrently.

Defendant's appeal followed on January 24, 2023. Defendant raises the following contentions for our consideration:

> POINT I
> STATE v. BANKSTON[5] WAS VIOLATED WHEN WITNESSES TESTIFIED ABOUT INADMISSIBLE HEARSAY THAT CONNECTED DEFENDANT TO THE CRIME.
>
> POINT II
> BANKSTON WAS FURTHER VIOLATED WHEN THE OFFICERS CONTENDED ON THE INTERROGATION VIDEO OF CODEFENDANT REYNOSO THAT THEY HAD PROOF OF GUILT, AND THE COURT'S LIMITING INSTRUCTION CONCERNING THESE STATEMENTS DID NOT ADDRESS THE BANKSTON VIOLATIONS. REYNOSO'S STATEMENT IMPLICATING DEFENDANT ALSO INFRINGED UPON DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM. FINALLY, THE OFFICERS GAVE IMPERMISSIBLE LAY OPINIONS IN VIOLATION OF RULE 701. THE ADMISSION OF THIS INTERROGATION VIDEO DEPRIVED DEFENDANT A FAIR TRIAL.
>
> POINT III
> DETECTIVES RODRIGUEZ AND FLORES GAVE OPINIONS ON SHARPLY DISPUTED FACTS CONCERNING THE THIRD-PARTY GUILT DEFENSE. SPECIFICALLY, THEIR OPINION

---

[5] 63 N.J. 263 (1973).

SUPPORTED AN ALLEGED ALIBI FOR THE THIRD PARTY. THE DETECTIVES WERE NOT WITNESSES TO THE EVENT GIVING RISE TO THE PURPORTED ALIBI, AND THEREFORE, THEIR TESTIMONY VIOLATED RULE 701, DENYING DEFENDANT A FAIR TRIAL.

POINT IV
DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE LACK OF CRITICAL JURY INSTRUCTIONS ON ADVERSE INFERENCE REGARDING THE STATE'S FAILURE TO PRESERVE THE MUSIC STUDIO VIDEO AND REGARDING THIRD PARTY GUILT.

POINT V
THE PROSECUTOR COMMITTED MISCONDUCT BY MISCHARACTERIZING EVIDENCE, MISSTATING THE LAW, NARRATING THE SURVEILLANCE VIDEO, AND DIMINISHING THE STATE'S REASONABLE DOUBT BURDEN.

POINT VI
THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR A NEW TRIAL BECAUSE THE JURY VERDICT WAS NOT RATIONALLY BASED IN THE EVIDENCE.

POINT VII
THIS COURT SHOULD REMAND FOR RESENTENCING FOR THE COURT TO RECONSIDER THE CONSECUTIVE SENTENCES, STATE v. TORRES[,][6] AND BECAUSE THE SENTENCE WAS NOT BASED ON COMPETENT, CREDIBLE EVIDENCE IN THE RECORD.

---

[6] 246 N.J. 246 (2021).

A-1533-22

We first address defendant's contentions regarding the video recording of Reynoso's interrogation, which was played for the jury at trial. The trial court redacted portions of the recording and issued a limiting instruction regarding statements made by the detectives on the recording. Defendant argues on appeal that the redactions and instruction were insufficient, and that the introduction of the interrogation video deprived him of his right to a fair trial. Generally, he argues that statements by the detectives would have been inadmissible if offered from the witness stand and did not become admissible just because they were instead offered in a recording of an interrogation.

### A. The Interrogation Video and Redaction Process

We begin by briefly summarizing the interrogation video and the trial court's redaction process.

### 1. The Interrogation Video

During the interrogation, detectives questioned Reynoso about his possible involvement with the May 15 shooting, and he consistently said he was "passed out" at the time. He said he was with a group at the Howe Avenue residence after playing basketball with friends in the afternoon. He said he smoked marijuana, drank alcohol, took a Percocet pill, and fell asleep by 10:00

or 10:30 p.m. He remembered waking up around 5:00 a.m. on May 16 because his mother was calling him. Reynoso said he had heard a "kid died supposedly, uh, for stealing cars or car pieces," that he had "looked it up on Google," and that he didn't know anything else.

During the questioning, the detectives repeatedly said that they had "videos" and "photos" they could show Reynoso that depicted him outside on the night of May 15 and urged him to "cooperate" and "explain what happened." They told Reynoso he was "[t]here for a reason" and that his name had been "brought up multiple times." Flores advised Reynoso that police "already kn[e]w" where he was that night and said he should try to "save [his] a[**]" and stop saying he was asleep. He told Reynoso, "[Y]ou're either a witness to what happened or you're the shooter." Reynoso adamantly repeated his version of events several times and denied being the person in the videos the detectives played for him.

Also during the questioning, police asked Reynoso to name the friends who hung out at the Howe Avenue residence, and he mentioned "Grande," defendant's nickname. Reynoso said defendant "shouldn't drive" and did not have a car. Flores confronted Reynoso about this, saying, "You're telling me that Grande doesn't drive. That's off. We already know he drives. All right?"

22

He later said Reynoso's statement that defendant did not drive a car was "bulls[**]t" and "ridiculous." Flores said he knew a car was sold or given to defendant "at least two months" ago and questioned why Reynoso would claim he did not know that. While challenging Reynoso on this subject, Flores and Velarde said that if one person involved in the crime was the driver, the other one was shooting. Flores said that if Reynoso thought defendant was "gonna say he shot the gun," he was "outta [his] f[**]kin' mind." Flores and Velarde said they had a video of "everywhere [the car] went" on May 15, and that Reynoso was seen in the car.

At another point, while again naming people who hung out at the Howe Avenue residence, Reynoso said defendant was there "sometimes—well most of the time, you know, 'cause that's his sister's house." Rodriguez accused Reynoso of trying to keep defendant "outta the whole equation," saying that every time Reynoso spoke about defendant it seemed like he "[didn't] wanna mention [him] always bein' there when he's always there." Rodriguez said Reynoso was quicker to name other friends, but "never wanted [to] bring up Grande" and would only mention him "be[ing] there too" as an afterthought. Velarde also said Reynoso had "tried to minimize [his] involvement with Grande from the start of [the] interview," and acted like he "barely even knew Grande."

A-1533-22

## 2. The Trial Court's Redactions

The parties first discussed redactions to the video recording of Reynoso's interrogation at a pretrial hearing on March 3, 2020. The court addressed each portion that defendants thought should be removed, and in some cases determined that the redactions sought by defendants should not be made. The redaction issue was ostensibly settled at the conclusion of this hearing, but when the court began to play the video for the jury at defendants' retrial over two years later, defendant's counsel objected to a portion of the statement that he thought had been redacted. The court responded that it had assumed the defense had read the transcript of the version of the video to be presented and "would have made any objections before this time," but excused the jury for the day to allow defense counsel to look through the transcript and make "any arguments that we're going to have on this issue."

The parties and court then spent the remainder of the day going through the entire transcript line by line. The court agreed to some of defendants' requested redactions and rejected others. Notably, the court declined to redact the detectives' assertions that they had videos of Reynoso, finding that the jury would decide whether Reynoso was truly depicted in any such videos and that the detectives were simply using "interview techniques" that were "well

established." The court found that Flores and Velarde were "permitted to question [Reynoso] about his truthfulness while giving him an opportunity to view the evidence the police [had] that they believe[d] show[ed] his alleged involvement." The court redacted "conclusory remarks" such as "you are guilty as f[**]k" or "I know for a fact it is you on the video," but found that redacting all instances where detectives discussed their "opinion[s]" about what was shown in videos while challenging Reynoso's account "would wholly eviscerate . . . law enforcement's legally permissive ability to use an interrogation as an investigative tool." The court concluded that "giving the jury a concise and direct limiting instruction mandating how [it] can consider and use the video will protect the integrity of the trial."

Ultimately, the redacted portions of the interrogation included statements by the detectives: 1) that they knew Reynoso was lying; 2) that they "knew for a fact" that he did not pass out and was guilty; 3) that they "recognized" Reynoso in the videos; 4) that they had evidence that "prove[d]" it was Reynoso "in the car;" 5) that a video showed Reynoso getting out of defendant's car after "doing the murder;" 6) that they "already ha[d] one" person in jail and Reynoso was "the other;" 7) that someone had been seen in a car who "matche[d] [Reynoso's] exact physical description, [his] clothing and everything;" 8) that Reynoso did

25

not want to talk about defendant's car because he was "guilty as f[**]k" and "[didn't] wanna own up to s[**]t;" 9) that Reynoso was facing incarceration pending trial and a lengthy sentence for murder; 10) that Reynoso was going to "go to jail" after giving his statement; and 11) that a jury would see the surveillance videos, recognize Reynoso, and know he was guilty. Also redacted were statements by Reynoso: 1) that he had been arrested once before with friends; and 2) that he knew someone who had been "locked up," presumably defendant.

The court declined to redact statements by the detectives: 1) that Reynoso was "either the shooter or the driver;" 2) that the detectives "ha[d] clip after clip after clip," including "daytime video [and] nighttime video of [Reynoso] wearing the same clothing;" 3) that the detectives "kn[e]w for a fact the driver came out—and the other guy that came outta that car was [Reynoso];" 4) that the video showed Reynoso "looking for . . . a bullet" or a "round" in the car after the shooting; 5) that Reynoso was not "sitting here by mistake" and was "here for a reason;" 6) that the detectives had "video" and "evidence that brought" them to Reynoso, that his "name . . . was brought up multiple times," and that "people are quick to drop others' names;" 7) that Reynoso "already f[**ked] up in one spot by telling [detectives] that [defendant] doesn't drive" and that the

26

detectives "know he drives;" and 8) that Reynoso was "trying to minimize his involvement with [defendant]" and "keep [defendant] out of the whole equation" even though defendant is "always there." The court also declined to redact statements by Reynoso that 1) defendant was at the Howe Avenue residence the night of the shooting and is there "most of the time" because it is his sister's house and 2) that the detectives "probably have evidence."

After the prosecutor made the redactions, the court asked all counsel to review the updated video to make certain it complied with the prior discussion. At a June 7 hearing, all counsel and the court reviewed the portions of the video where redactions were made. Afterward, defendant's counsel stated that the updated video was "good the way it is" besides small additional changes not relevant to this appeal.

The parties also discussed the possibility of a limiting instruction. Reynoso's counsel argued for an instruction stating that the detectives did not have special knowledge and that only the jurors were factfinders in the case. The court agreed and read to the jury the instruction it had proposed to counsel. Both defense counsel agreed that the limiting instruction read to the jury was satisfactory.

A-1533-22

On the next day of trial, playback of the new version of the statement resumed before the jury. The court instructed the jury at the outset that:

> [D]uring the course of this statement you may hear a detective's subjective opinion regarding what is depicted in S-97, the surveillance video.[7] I'm instructing you that Detective Flores and Detective [Velarde] do not possess any specialized knowledge or information and thus their subjective opinion as to what S-97 may depict . . . is not evidence in this case. It is simply an interrogation technique used by law enforcement during the questioning of a suspect. I am instructing you that the fact that a law enforcement officer may insert his or her subjective belief into a question or statement during the interrogation is not evidence and must not be considered by you in any manner whatsoever as proof of a defendant's guilt.
>
> As I have continuously emphasized throughout this trial, you and you alone are the sole fact finders in this case.
>
> You will have the video, S-97, for your independent consideration during your deliberations.
>
> As the sole judges of the facts, you and you alone are to determine whether the State has proven beyond a reasonable doubt the identification of the perpetrators.

The court repeated this limiting instruction in its final instructions to the jury before deliberations.

---

[7] S-97 refers to the State's surveillance compilation video that was eventually published to the jury.

B. "Testimony" in the Interrogation Video

Defendant argues that portions of the redacted interrogation video violated his right to a fair trial. Specifically, he argues that: (1) statements by the detectives constituted impermissible opinion testimony on the contents of the surveillance videos, including the identity of persons appearing in the videos, as well as on the ultimate issue of defendant's guilt; (2) statements by the detectives violated Bankston by implying the police had additional incriminating information from a non-testifying source; and (3) statements by Reynoso that defendant was at the Howe Avenue residence the night of the shooting violated defendant's Confrontation Clause rights. Reynoso in his appeal makes similar arguments, contending that the detectives impermissibly identified Reynoso as one of the individuals in the car in the video and implied that they had additional, undisclosed evidence of his guilt.

A trial court's evidentiary rulings are reviewed for abuse of discretion and are entitled to deference absent a showing that there has been a "clear error of judgment." State v. Singh, 245 N.J. 1, 12 (2021) (citations omitted). Such rulings "are subject to limited appellate scrutiny," State v. Buda, 195 N.J. 278, 294 (2008), since trial judges enjoy "broad discretion" in making evidence-related decisions, State v. Harris, 209 N.J. 431, 439 (2012) (citation omitted).

Here, we conclude that the detectives' statements made in the context of the interrogation are critically distinct from live trial testimony, and we see no error in the trial court's decision to partially redact the interrogation video and issue a limiting instruction.

## 1. Opinion Testimony

We first address defendant's contention that the detectives' statements constituted impermissible lay opinion testimony on the content of the surveillance video—including their identification of Reynoso in the footage—and on the ultimate issue of defendants' guilt. Defendant contends these statements invaded the fact-finding province of the jury and that the court's limiting instruction was insufficient to cure the resulting prejudice.

In support of this argument, defendant cites, among other cases, State v. McLean, 205 N.J. 438, 461 (2011) (holding that witnesses may not "intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out" or "express a view on the ultimate question of guilt or innocence"); Singh, 245 N.J. at 18 (barring police officer from identifying a defendant while narrating a surveillance video for the jury); and State v. C.W.H., 465 N.J. Super. 574, 596 (App. Div. 2021) (finding plain error where, following the playing of defendant's recorded interrogation

for the jury, detective testified that defendant was guilty and untruthful in the interrogation). These cases all involve live trial testimony, but defendant suggests they also apply to statements made in a recorded interrogation later played for the jury.

While there is scant published New Jersey authority on this issue, we addressed a similar question in State v. Cotto, 471 N.J. Super. 489 (App. Div. 2022). In that case, an arson prosecution, the State played a recording of defendant's interrogation at trial, in which detectives repeatedly asserted that surveillance video footage depicted the defendant setting the fire in question.[8] Id. at 533. Like defendants here, Cotto argued that this was "the functional equivalent of impermissible lay opinion testimony" and "improperly presented the officers' opinion on the ultimate question of whether [he was] guilty." Ibid.

We rejected that argument, holding that the detectives' remarks "were not presented to the jury as lay opinion testimony, but rather as statements . . . made to [the] defendant to induce him to admit that he was the person depicted in the surveillance video starting the fire." Id. at 538. In other words, the detectives

---

[8] For instance, the detectives in Cotto stated, "[h]ere you are splashing gas," "the video shows you doing it," and "[y]ou've got that Molotov cocktail. You've got the gas can, you got the clothes, the hat, the car. We have you. Clear as day." Id. at 533-34.

"were not expressing their opinion in the guise of assisting the jury, but rather expressing their opinion to defendant to prompt him to reply in the course of the stationhouse interrogation." Id. at 540. We thus held that cases such as Singh and McLean were distinguishable because they involved live trial testimony, not statements made in a custodial interrogation. Id. at 538-40. As a result, we found no error in the trial court's admission of the statements by the detectives. Id. at 538-41.

However, we also noted that "the better practice" was to instruct the jury "that the detectives' statements made during the stationhouse interrogation should not be deemed testimony and may be considered only in the context of understanding how the interrogation was conducted and how [the] defendant responded to the forceful accusations that were made against him during the course of the interrogation." Id. at 540-41. We found that the court's failure to so instruct sua sponte was error but did not rise to the level of plain error. Ibid.

Here, as in Cotto, we find that Singh, McLean, C.W.H., and other cases involving live trial testimony are distinguishable, and we are unpersuaded by defendant's argument that further redactions to the interrogation video were required. It was the trial court's job to balance the potential prejudice of the statements in the interrogation video against their value in providing context for

32

Reynoso's responses. The court redacted the most inflammatory statements and, as we recommended in Cotto, issued a limiting instruction after receiving input from all parties. That instruction told the jury—before the interrogation video was played and again before deliberations—that the detectives' "subjective opinion[s]" about the contents of the surveillance video were "simply an interrogation technique" and "must not be considered in any manner whatsoever as proof of a defendant's guilt."

Furthermore, the instruction specifically referred to detectives' opinions about "S-97," the surveillance compilation video the jury eventually received on a laptop, and noted that the detectives did not "possess any specialized knowledge or information." This conveyed to the jury that the detectives were not commenting on or referring to any video footage beyond what the jury eventually received, allowing it to decide for itself what that footage showed. In these circumstances, we conclude there was no error in the trial court's decision.

## 2. Confrontation Clause Violations

Defendant further argues that various statements by the detectives in the interrogation video implied they had incriminating information from a non-testifying source, in violation of the hearsay rule and his Confrontation Clause

rights. For instance, detectives stated that Reynoso's "name was brought up multiple times" and that he was "not sitting here by mistake," and also asserted that they "kn[e]w" defendant drove the car depicted in the video. Defendants argue that, like in Bankston and State v. Branch, 182 N.J. 338 (2005), these statements created an "inescapable inference" that the detectives had received incriminating information from a non-testifying source, thereby violating the hearsay rule and Confrontation Clause. Defendants further contend the court's limiting instruction failed to cure this error because it did not do enough to directly dispel an inference that the detectives had access to incriminating information that the jury lacked.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution afford an accused in a criminal case the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "[B]oth the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Branch, 182 N.J. at 350 (citing Bankston, 63 N.J. at 268-69). Our Supreme Court has repeatedly recognized that "a police officer may not imply to the jury that he possesses superior knowledge, outside

the record, that incriminates the defendant." State v. Watson, 254 N.J. 558, 610 (2023) (collecting cases). Thus, the hearsay rule and Confrontation Clause may be violated if a police witness "repeat[s] what some other person told him concerning a crime by the accused" when explaining the reasons for taking a particular investigative action. Bankston, 63 N.J. at 268-69 (citations omitted). However, it is "well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of a crime by stating that he did so 'upon information received,'" without elaboration. Id. at 268.

Here, as with his opinion testimony argument, we conclude that defendant's reliance on Bankston, Branch, and similar Confrontation Clause cases is misplaced, because those cases all involve testimony by officers at trial, not statements made in the context of a recorded interrogation. While the defendant in Cotto did not make a Confrontation Clause argument, 471 N.J. Super. at 540 n.14, we believe Cotto's rationale equally applies to this issue: the detectives' remarks that Reynoso's "name was brought up," that he was not "sitting here by mistake," and that they know defendant drives the car in the video were presented to the jury not as testimony, but as statements made to induce Reynoso to confess in the context of a custodial interrogation. This non-

testimonial purpose was reinforced by the court's limiting instruction, which told the jury that the detectives "do not possess any specialized knowledge or information" and "the fact that a law enforcement officer may insert his or her subjective belief into a question or statement during the interrogation is not evidence and must not be considered by you in any manner whatsoever as proof of a defendant's guilt."[9]  As a result, we conclude that there was no error in the trial court's decision not to redact the detectives' remarks.

### 3. Reynoso's Statements

Finally, we address defendant's contention that statements by Reynoso in the interrogation video violated defendant's Confrontation Clause rights. Specifically, Reynoso mentioned defendant as one of the people at the Howe Avenue residence on the night of the shooting, and he later stated that defendant was there "most of the time" because "that's his sister's house."  Detectives then suggested that Reynoso was trying to avoid mentioning defendant and "keep him out of the equation," but that defendant is "always there, right?" to which Reynoso responded, "Yeah."  Reynoso also stated at one point that the detectives

---

[9]  We acknowledge that while the instruction specifically referred to detectives' statements about the contents of the surveillance video, it did not explicitly address the Confrontation Clause issue.  However, we find that the instruction adequately conveyed that the jury was not to treat the detectives' statements as evidence.

"probably have evidence."  Defendant, citing <u>Bruton v. United States</u>, 391 U.S. 123 (1968), argues that these statements implicated him in the crime and violated his Confrontation Clause rights, as he was not able to cross-examine Reynoso.

In <u>Bruton</u>, the United States Supreme Court held that a defendant's Confrontation Clause rights are violated "by the admission of [a] co-defendant's incriminatory confession, even if curative jury instructions [are] later given." <u>State v. Weaver</u>, 219 N.J. 131, 153 (2014) (citing <u>Bruton</u>, 391 U.S. at 126). <u>Bruton</u>'s application, however, "is limited," and it "does not apply to a statement that is linked to the defendant only through other evidence and is 'not incriminating on its face.'" <u>Ibid.</u> (quoting <u>Richardson v. March</u>, 481 U.S. 200, 208 (1987)).

In <u>Bruton</u> and the other cases defendant's brief cites, codefendants gave statements that were explicitly incriminating.  <u>See Bruton</u>, 391 U.S. at 124 (codefendant confessed that he and defendant committed an armed robbery); <u>State v. Laboy</u>, 270 N.J. Super. 296, 302 (App. Div. 1994) (codefendant's statement "placed most of the blame for the killing on the defendant"); <u>State v. Haskell</u>, 100 N.J. 469, 471 (1985) (codefendants' statements "graphically describe[d]" and admitted to the killing).  Here, in contrast, Reynoso

A-1533-22

consistently denied his or anyone else's involvement in the crime, repeatedly stating that he passed out at the Howe Avenue residence at 10:00 or 10:30 p.m., did not appear in the State's surveillance footage, and did not know who committed the shooting.

To the extent Reynoso's statements provided circumstantial evidence of defendant's guilt, that evidence is not the type of "powerfully incriminating" confession contemplated by <u>Bruton</u> and its progeny. <u>State v. Melendez</u>, 129 N.J. 48, 58 (1992) (concluding that codefendant's flight was only "circumstantial evidence of [defendant]'s guilt" and therefore not a <u>Bruton</u> concern). In these circumstances, we find no error in the trial court's decision not to redact Reynoso's mentions of defendant from the interrogation video.

## III.

We next address defendant's contentions that trial testimony by several detectives as well as Hadjiedj constituted inadmissible hearsay in violation of his Confrontation Clause rights, warranting reversal of his conviction. We find no reversible error in this testimony or the trial court's response to it.

### A. Detective Merced's Statement

Defendant's first contention concerns Detective Merced's statement, referring to the surveillance video, that "the second person in the vehicle . . . did

the shooting."  While the trial court found this statement "wholly inappropriate" and issued a curative instruction, defendant argues that the instruction was insufficient and that Merced's remark constituted reversible error.  More specifically, he contends that the instruction failed to sufficiently clarify that her remark was not based on information or evidence outside of the record.

To provide context for our analysis, we begin by summarizing the pertinent portions of the trial transcript.  During Merced's testimony, the prosecutor asked her about surveillance footage she reviewed from a location "a few houses" away from the Howe Avenue residence.  The prosecutor asked, "While watching the video . . . [did] you identify another person of interest?" Merced answered, "Yes."  The prosecutor asked, "And why was this particular person of interest to you based on your review of this video?"  Merced said, "He was the second person in the vehicle."  When the prosecutor asked what she meant, Merced said, "The second person in the vehicle who did the shooting."

Both defendant's and Reynoso's counsel objected, arguing that Merced's statement was impermissible testimony on the ultimate issue of defendants' guilt. Defendant's counsel additionally moved for a mistrial, although Reynoso's counsel did not join that request.  The court found that Merced's remark was "wholly inappropriate" and sustained the objection.  However, it denied the

39

request for a mistrial, determining that the error was not "such that manifest injustice would result from the continuation of the trial," and that a curative instruction would suffice to remedy any prejudice from the remark. The court then solicited proposed curative instructions from both defense counsels, drafted an instruction incorporating their suggestions, and revised it based on their further feedback.

Specifically, both defense counsels requested that the instruction dispel the jury's potential impression that Detective Merced's remark was based on her knowledge of additional, undisclosed evidence. When presented with the court's revised instruction, both defense counsel agreed it was "fine." The court ultimately instructed the jury:

> Ladies and gentlemen, I am striking the witness's last answer as it was wholly inappropriate and legally impermissible. Detective Merced does not possess any specialized knowledge or information and, thus, her ultimate opinion as to the identification of the perpetrators is irrelevant and must not be considered by you.
>
> As I told you at the outset of these proceedings, and as I have continued to emphasize throughout the course of this trial, it is for you and you alone as the sole fact finders, to determine whether the State has proven beyond a reasonable doubt the identification of the perpetrators.

40

As with all testimony that has been stricken, it is not evidence in this case and, therefore, it cannot be considered by you or influence your decision-making process in any manner whatsoever.

The governing legal principles are well-settled and may be briefly summarized. A police officer may not testify as to a defendant's guilt or truthfulness. C.W.H., 465 N.J. Super. at 593-94. That is because "a jury's determination of criminal guilt or innocence is its exclusive responsibility." State v. Odom, 116 N.J. 65, 77 (1989). Additionally, under the Confrontation Clause and hearsay rule, "a police officer may not imply to the jury that [they] possess[] superior knowledge, outside the record, that incriminates the defendant." Watson, 254 N.J. at 610.

We agree with the trial court that Merced's remark was "wholly inappropriate." Merced testified that a "person of interest" she learned about following review of surveillance footage was "the second person in the vehicle who did the shooting." She did not mention either defendant by name, but it would be logical to infer that she was talking about Reynoso. Her statement therefore amounted to an impermissible assertion that Reynoso was guilty. Furthermore, Merced's remark may have suggested to the jury that she was privy to additional, undisclosed evidence or information connecting the car and/or

Reynoso to the crime, thereby violating the Confrontation Clause and hearsay rule.

However, while we agree that Merced's statement was improper, that does not end our inquiry, as we must determine whether the trial court's curative instruction sufficed to remedy the statement's prejudicial effect, or whether a mistrial (or a stronger instruction) was required. "The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court." State v. Harvey, 151 N.J. 117, 205 (1997). An appellate court should defer to a trial judge's decision, since they are "in the best position to gauge the effect of the allegedly prejudicial evidence." Ibid. Thus, the denial of a mistrial motion should not be disturbed "absent an abuse of discretion that results in a manifest injustice." Ibid. We apply this "same deferential standard" to our review "of the curative instruction itself." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019) (citing State v. Winter, 96 N.J. 640, 647 (1984)).

A mistrial is "an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting Harvey, 151 N.J. at 205 (1997)). "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Allah, 170

42

N.J. 269, 281 (2002)). Such alternative actions include the use of "a curative instruction, a short adjournment or continuance, or some other remedy." Ibid.

Our review of a court's curative instruction is guided by several additional principles. "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." C.W.H., 465 N.J. Super. at 596 (quoting Winter, 96 N.J. at 647). Additionally, evidence that "bears directly on the ultimate issue before a jury" may be "less suitable" for resolution through a curative or limiting instruction than evidence that "is indirect and that requires additional logical linkages." Herbert, 457 N.J. Super. at 505. Finally, the instruction itself must be "firm," "clear," and "specific[]." State v. Vallejo, 198 N.J. 122, 134-36 (2009) (collecting cases with effective curative instructions).

Here, defendant argues the curative instruction was insufficient because it "did not attend to the essence of the problem that the jury was not to consider that Merced had other information that formed her opinion that defendant was guilty." However, the instruction—which was drafted with the parties' assistance and input—explicitly told the jury that Merced did not have "any specialized knowledge or information" and that her "ultimate opinion" was therefore "irrelevant." The court also emphatically told the jurors, as it had on

43

prior occasions and continued to do throughout the trial, that it was their sole province to decide whether the State had proven defendants were the ones who committed the crimes.

Moreover, defendants had the opportunity to cross-examine Merced and other police witnesses to challenge their investigation and call into question the evidence they collected. They were able to argue to the jury that there was no video of the shooting and no eyewitness identifications, and that even witness's descriptions of the car involved were inconsistent. In these circumstances, we are satisfied the trial court did not abuse its discretion in denying defendant's motion for a mistrial and that its specific and strongly worded curative instruction was an "appropriate alternative course of action" that did not result in a manifest injustice. Smith, 224 N.J. at 47 (quoting Allah, 170 N.J. at 281).

### B. Detectives Rodriguez and Posada's Testimony

We turn next to defendant's contention that testimony by detectives Rodriguez and Posada impermissibly implied they had received incriminating information from an unknown, non-testifying source, in violation of Bankston, and its progeny.

We begin by summarizing the pertinent portions of the trial transcript. Defendant points to three instances in which the detectives allegedly gave

improper testimony. The first one occurred when the prosecutor asked Rodriguez if at some point during his investigation, he "receiv[ed] information of another potential person of interest." Rodriguez said, "that's correct," and the prosecutor asked, "What was the information that you received?" Rodriguez said, "It was pertaining to a Facebook profile that the individual somehow related to this matter," and added that the name "Grandee Vargas" was provided.

In the second instance, the prosecutor asked Detective Posada what he "[did] next" after the execution of the search warrant at the Howe Avenue residence. Posada replied, "Later in the investigation, another person was identified as being of interest, and ultimately brought in for questioning." When asked who "this person" was, Posada answered, "Mr. Reynoso." Finally, the prosecutor asked Detective Rodriguez, "Did you learn of a [gas station on Main Avenue] that had some significance?" Rodriguez answered, "Yes."

Turning to the applicable legal principles, as we have noted, a trial court's evidentiary rulings are reviewed for abuse of discretion and are entitled to deference absent a showing that there has been a clear error of judgment. Singh, 245 N.J. at 12. Such rulings "are subject to limited appellate scrutiny," Buda, 195 N.J. at 294, since trial judges enjoy "broad discretion" in making evidence-related decisions. Harris, 209 N.J. at 439. Additionally, because neither

defendant objected to any of the challenged testimony, we review the trial court's decisions for plain error. R. 2:10-2.

We reiterate that "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Branch, 182 N.J. at 350 (citing Bankston, 63 N.J. at 268-69). As previously stated, our Supreme Court has repeatedly recognized that "a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Watson, 254 N.J. at 610 (collecting cases). Thus, the hearsay rule and Confrontation Clause may be violated if a police witness "repeat[s] what some other person told him concerning a crime by the accused" when explaining the reasons for taking a particular investigative action. Bankston, 63 N.J. at 268-69. However, it is "well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of a crime by stating that he did so 'upon information received,'" without elaboration. Id. at 268.

In Bankston, police officers entered a tavern and found drugs near where the defendant was sitting. Id. at 265. The defendant was subsequently arrested. Id. at 265-66. At trial, one of the detectives testified that the defendant fit an

informant's description of a person with drugs in the tavern.  Id. at 266.  The Court found that although the detective "never specifically repeated what the inform[ant] had told [him], the inescapable inference from [the] testimony was that the inform[ant] had given information that defendant would have narcotics in his possession."  Id. at 271.  As a result, "the jury was led to believe that an unidentified inform[ant], who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime."  Ibid.  The Court therefore concluded that the detective's testimony was inadmissible hearsay and violated the Confrontation Clause.  Id. at 269, 271.

Applying these legal principles to the present facts, we see no error in the trial court's decision not to strike any of this testimony sua sponte.  Defendant argues for the first time on appeal that Rodriguez's testimony regarding the Facebook profile implies that defendant "was implicated in this crime because of information contained on Facebook, all of which was inadmissible hearsay from an unknown source."  However, Rodriguez never testified to what the information he received was, who gave it, or why it was "related."  Indeed, nothing in Rodriguez's statement suggests that anything on defendant's Facebook profile was incriminating; his remark might simply mean that defendant's Facebook profile was part of the information he received.  Unlike in

47

Bankston, then, there is no "inescapable inference" that any declarant—on Facebook or otherwise—provided incriminating information about defendant. Similarly, Posada's statement that Reynoso was "identified as being of interest" and Rodriguez's assertion that he "learn[ed] of" the Main Avenue gas station that had "some significance" are too general to compel an inference that a non-testifying witness provided incriminating information. We therefore hold that the trial court did not err in allowing this testimony.

## C. Hearsay Regarding Hadjiedj's Alibi

Finally, we address defendant's claim that Hadjiedj and several detectives offered inadmissible hearsay testimony regarding statements made by Hadjiedj and his alleged alibis about his whereabouts on the night of the incident. We discern the following pertinent facts from the record. Detective Rodriguez testified, "I was advised that Mr. Hadjiedj stated that he was at a music studio in the city of Clifton" the night of the incident. Hadjiedj testified that he "gave [police] the name of . . . three or four friends" who could corroborate his alibi; that one of his friends, Chemo,[10] "told [the police] where we were that night;" and that another friend, who initially told police he was not at the studio, later

---

[10] While Hadjiedj did not identify Chemo by name, Detective Merced's testimony indicates that this is who Hadjiedj was referring to.

told Hadjiedj that this was a lie. Defense counsel did not object to Rodriguez's or Hadjiedj's statements. On cross-examination, Detective Merced testified that Chemo told her Hadjiedj was at the studio that night and that that was Hadjiedj's alibi. Also on cross-examination, Detective Flores testified that Chemo was "Hadjiedj's alibi witness that he was in the studio."

We emphasize "the general principle that the failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial." Cotto, 471 N.J. Super. at 537-38 (citing State v. Nelson, 173 N.J. 417, 471 (2002), and State v. Frost, 158 N.J. 76, 84 (1999)); see also New Jersey Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348-49 (App. Div. 2016) ("[H]earsay subject to a well-founded objection is generally evidential if no objection is made"). Here, because no objection was made to any of the above testimony, we decline to find any error in the court's failure to strike it sua sponte. Furthermore, with respect to Detectives Merced and Flores's testimony, we note that their remarks were elicited by defense counsel on cross-examination; in fact, any hearsay in the exchange was spoken by defense counsel himself in leading questions.[11] Trial errors that "'were induced, encouraged or

---

[11] For instance, defendant's counsel asked Merced, "So Chemo says that he was at the studio with [Hadjiedj], right?" and Merced answered, "Yes."

acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. Corsaro, 107 N.J. 339, 345 (1987). Here, we see no reversible error.

IV.

We next address defendant's contention that he was denied a fair trial because Detectives Rodriguez and Flores improperly testified about the music studio surveillance video which the State failed to preserve.

A. Music Studio Surveillance Footage

At trial, Rodriguez testified that he and Detective Flores reviewed three to four hours of footage from the music studio depicting Hadjiedj and five or six individuals "listening to music [and] smoking hookah." Rodriguez further testified that he and Flores observed Hadjiedj arrive at 9:35 p.m. and leave at approximately 12:50 a.m. Because the State failed to secure the footage, it was never admitted into evidence for the jury to review.

Defendant argues that the detectives' testimony undermined his third-party guilt defense while bolstering Hadjiedj's alibi and exceeded the bounds of narration testimony imposed by Watson. Defendant asserts that the detectives' lay opinion testimony failed to satisfy both requirements of Rule 701 because the officers were not familiar with Hadjiedj, and their testimony did not assist

the jurors—who were capable of making an independent assessment of Hadjiedj's testimony including the credibility of his alibi.

At the outset we note that the trial court's decision to admit the detectives' testimony regarding their observations of the music studio surveillance video is an evidentiary ruling reviewed for abuse of discretion. See Singh, 245 N.J. at 12. "We do not substitute our judgment for that of the trial court 'unless the evidentiary ruling is so wide of the mark that it constitutes a clear error in judgment.'" State v. Allen, 254 N.J. 530, 543 (2023) (quoting State v. Garcia, 245 N.J. 412, 430 (2021) (internal quotation marks omitted)).

We first address defendant's narration argument. In Watson, our Supreme Court stated, "narration evidence by a witness who did not observe events depicted in a video in real time may not include opinions about a video's content and may not comment on facts the parties reasonably dispute." 254 N.J. at 599. This rule was fashioned to prohibit witnesses from narrating, or "describing, in real time, the content of a video as it is being shown to the jury." State v. Watson, 472 N.J. Super. 381, 448 (App. Div. 2022), rev'd on other grounds, 254 N.J. 558 (2023). Such narration "invade[s] the province of the jury" where the jury can view the video and determine for themselves what it depicts. State v. Higgs, 253 N.J. 333, 366 (2023). See also McLean, 205 N.J. at 461 (noting that

witnesses may not "intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out" or "express a view on the ultimate question of guilt or innocence").

Here, however, the detectives' testimony cannot be characterized as narration because they did not describe the contents of a video in real time as it was played for the jury. Nor could the witnesses have intruded on the jury's fact-finding role because the video was never presented to the jury to make independent conclusions about its content. We therefore reject defendant's assertion that this testimony was subject to the analytical framework established in Watson relating to narration testimony.

We next consider defendant's argument that the detectives' testimony failed to satisfy the requirements of lay opinion testimony contained in Evidence Rule 701. N.J.R.E. 701 provides, "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue."

Pursuant to the perception prong, the testimony must be based on the witness' "actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting

State v. LaBrutto, 114 N.J. 187, 197 (1989)).  "The witness need not have witnessed the crime or been present when the photograph or video recording was made in order to offer admissible testimony."  Id. at 469.  "The purpose of N.J.R.E. 701 is to ensure that lay opinion is based on an adequate foundation."  Neno v. Clinton, 167 N.J. 573, 585 (2001).

Underlying the perception prong of Rule 701 is the personal knowledge requirement set forth in N.J.R.E. 602:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

Our Supreme Court, reviewing the case law applying Rules 701 and 602 to law enforcement testimony, explained:

> In Singh, a detective testified that sneakers depicted in a surveillance video were similar to ones he saw the defendant wearing at the time of his arrest. 245 N.J. at 19.  The sneakers and the video were in evidence.  Id. at 4.  Because the detective "had first-hand knowledge of what the sneakers looked like" from the arrest, we found the testimony "was rationally based on his perception."  Id. at 19-20.
>
> . . .
>
> In [Sanchez], the Court addressed identification testimony from a parole officer who had met with the defendant more than thirty times. [247 N.J. at 458].  As

part of a homicide and robbery investigation, the officer identified the defendant in a still photo from a surveillance video. Ibid. The trial court found the proposed testimony failed both prongs of Rule 701. Id. at 462. We reached the opposite conclusion. Because the officer had met with the defendant on many occasions, we found the identification satisfied Rule 701's perception prong. Id. at 469.

[Watson, 254 N.J. at 593.]

These cases underscore the importance of first-hand knowledge and a degree of familiarity with an individual to be able to identify them in a photograph or video. Watson also made clear that "[a]n investigator who has carefully reviewed a video a sufficient number of times prior to trial" can satisfy the "perception" and "personal knowledge" requirements of Rules 701(a) and 602. 254 N.J. at 601.

Although we do not consider the detectives' testimony to be subject to the specific framework established in Watson because it was not narration, we hold that the State failed to establish that the officers satisfied the prerequisites of "personal knowledge" and "perception" contained in Rules 602 and 701(a).

Detective Flores met with Hadjiedj once on May 17, 2017, prior to traveling to the music studio the following day. Detective Rodriguez obtained a photograph of Hadjiedj to familiarize himself with his appearance. It is unclear from the record or the detectives' testimony how many times they

54

reviewed the three to four hours of surveillance footage; however, the State's failure to preserve the video makes clear that the detectives could not have reviewed the footage numerous times prior to trial. Thus, the detectives could not have conducted the "careful review" that our Supreme Court contemplated could satisfy the "perception" and "personal knowledge" requirements of Rules 701(a) and 602. See Watson, 254 N.J. at 601. Accordingly, the detectives' testimony regarding the contents of the music studio surveillance footage should have been barred by the trial court because they lacked the requisite familiarity with Hadjiedj's appearance and failed to perform the review of the footage needed to satisfy the "perception" and "personal knowledge" requirements of Rules 701(a) and 602. We consider whether the error was reversible in Section IV.C.

## B. Bolstering

We next assess whether the detectives' testimony improperly bolstered Hadjiedj's testimony and alibi, thereby defeating defendant's third-party guilt defense. "The State may not attack one witness's credibility through another witness's assessment of that credibility." State v. R.K., 220 N.J. 444, 458 (2015) (citing State v. Frisby, 174 N.J. 583, 593-94 (2002); State v. Clausell, 121 N.J. 298, 337-38 (1990)). The risk of bolstering is of particular concern when the

witness is a member of law enforcement. See Clinton, 167 N.J. at 586 (recognizing that "[a] jury may be inclined to accord special respect to [police officer] witness[es]").

In R.K. the Supreme Court found that the victim's stepsister's testimony that she "believed" her sister, that she "wouldn't be making things up if it was not bad," and that "[s]he would never lie about something like this," improperly violated the principle that witnesses are precluded from giving opinions about another witness' credibility. 220 N.J. at 461.

In Frisby, a child died from abuse and the parents gave conflicting accounts of who was caring for the child when he suffered fatal injuries. 174 N.J. at 588-89. Police testified that their decision to charge the mother and not the father was based on hearsay statements of non-testifying witnesses that verified the father's alibi. Id. at 591. They also testified that they felt the father was "more credible than [the mother] at that point." Id. at 592. The Court found the admission of the police testimony to be plain error. As it later explained in State v. Trinidad, testimony "regarding the father's credibility unfairly and '"irresistibly" implicated [the mother].'" 241 N.J. 425, 446 (2020) (quoting Frisby, 174 N.J. at 593-96).

A-1533-22

Here, the detectives did not offer an opinion or assessment of Hadjiedj's credibility; rather, they testified relating to what they observed on the music studio surveillance footage. If that testimony corroborated Hadjiedj's alibi, that was a natural byproduct of their investigation. While we find that it was error to admit the detectives' testimony regarding the studio surveillance footage, their testimony did not constitute improper bolstering.

## C. Harmless Error Analysis

Having determined that the admission of the detectives' testimony relating to what they observed on the music studio surveillance footage constituted error, we next consider whether that error requires reversal. "A trial error is defined as an 'error which occurred during the presentation of the case to the jury,' and therefore may 'be quantitatively assessed in the context of other evidence presented in order to determine whether it was harmless beyond a reasonable doubt.'" State v. Camacho, 218 N.J. 533, 547 (2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)). "When we consider whether a given error is harmless, that error 'must be evaluated in light of the overall strength of the State's case.'" Allen, 254 N.J. at 550 (quoting State v. Galicia, 210 N.J. 364, 388 (2012)). "[I]n appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced

against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial." Ibid.

Balancing the error against the State's case, we find that the admission of the detectives' testimony related to the music studio surveillance footage was harmless beyond a reasonable doubt.

First, the import of the detectives' testimony did not directly link defendants to the crime. The State's key evidence concerning defendants' guilt was the surveillance compilation video that showed defendants in a gray vehicle near the crime scene minutes before and after the shooting. The jury's request for Merced's testimony relating to the surveillance compilation video demonstrates its significance in their deliberations. Additionally, the detectives' testimony was carefully scrutinized by defense counsel. When cross-examining Rodriguez, defendant's counsel confronted him with his failure to preserve the video and the inconsistencies between his prior testimony that he could not recall downloading video footage at the studio or the camera's position and his current testimony that he attempted to download the footage and remembered the camera's location. Counsel also questioned Rodriguez's failure to write a police report or take any notes concerning what he did at the studio. Counsel

A-1533-22

further challenged Rodriguez on whether he could have accurately identified Hadjiedj, whom he did not know, based on a single photo.

During summation, defense counsel questioned the thoroughness of the police investigation and the reliability of the detectives' testimony relating to the music studio surveillance footage, stating, "he watched it five years ago and he can remember what was on a four hour video?" Counsel once again highlighted the absence of the video, lack of notes or reports, and contradictory explanations regarding the failure to preserve the video to cast doubt on its existence. Defense counsel argued, "You don't have the video to consider. You don't have a picture from that video. You have no verification that that video even exists." Defense counsel's summation also comprehensively presented its theory that Hadjiedj and Torlao committed the crime.

Reynoso's counsel similarly cast doubt on the existence of the footage and Hadjiedj's alibi during summation, stating, "[Hadjiedj] claims to be in the studio, which is about a mile from where the shooting takes place on Federal Street. He's there for five hours, four hours. . . [a]nd just about nobody can confirm that. And you haven't seen evidence of that."

A-1533-22

Applying the above facts to our assessment of the error, we conclude that it was harmless beyond a reasonable doubt. See Allen, 254 N.J. at 550 (quoting Galicia, 210 N.J. at 388).

V.

We next address defendant's contention that he was denied a fair trial based on the trial court's failure to instruct the jury regarding an adverse inference and third-party guilt.

A. Adverse Inference Charge

Whether there was a discovery violation authorizing the trial court to give an adverse inference instruction is a legal question subject to de novo review. See State v. Dabas, 215 N.J. 114, 131 (2013) ("If there was a violation of the discovery rule, we must then determine whether the trial court was empowered to impose the sanction of an adverse-inference charge. The Court reviews these legal issues de novo . . . ."). If the trial court had the authority to give the adverse inference charge, "we must then answer whether the trial court abused its discretion in not doing so." Id. at 132.

Defendant contends he was denied a fair trial because the trial court did not instruct the jury that they could draw an adverse inference from the State's failure to preserve the music studio surveillance footage. "An adverse-inference

charge is one permissible remedy for a discovery violation . . . ." Id. at 140. As our Supreme Court explained in Dabas,

> The criminal adverse-inference charge is analogous to the spoliation inference which may be drawn when evidence has been concealed or destroyed in civil cases. The spoliation inference—like the adverse-inference charge—"allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her."
>
> [Id. at 140 n.12 (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 401-02 (2001)) (emphasis added).]

"[N]either proof of bad faith, nor a showing that evidence is exculpatory, is essential to demonstrate a discovery violation or to justify an adverse inference charge." State v. Richardson, 452 N.J. Super. 124, 138 (App. Div. 2017). "An adverse inference charge may be warranted when a party's failure to present evidence 'raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him.'" Torres v. Pabon, 225 N.J. 167, 181 (2016) (quoting State v. Clawans, 38 N.J. 162, 170 (1962)).

We must first address whether the State's failure to preserve the music studio surveillance video constitutes a discovery violation. "Rule 3:13-3(b)(1) codifies [a] criminal defendant's 'right to automatic and broad discovery of the evidence the State has gathered in support of its charges.'" State v. Desir, 245

61

N.J. 179, 193 (2021) (quoting State v. Stein, 225 N.J. 582, 594 (2016)). The Rule "obligates the State to provide full discovery when it makes a pre-indictment plea offer or when an indictment is returned or unsealed." State v. Robinson, 229 N.J. 44, 72 (2017). We have "read Rule 3:13-3(b)(1) to imply a duty to preserve evidence pre-indictment, at least where the item is clearly destined for post-indictment disclosure and a defendant timely requests its preservation." Richardson, 452 N.J. Super. at 132-33. Evidence "clearly destined for post-indictment disclosure" includes exculpatory information or material. R. 3:13(b)(1).

"A defendant has a constitutional right to present a complete defense, including the 'right to introduce evidence of third-party guilt.'" State v. Hannah, 248 N.J. 148, 180 (2021) (quoting State v. Cope, 224 N.J. 530, 551 (2016)). Such evidence is admissible if "the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." State v. Perry, 225 N.J. 222, 238 (2016). "The doubt cast on the State's case must be based on 'specific evidence linking the third-person to the crime' or to the victim.'" Hannah, 248 N.J. at 181 (quoting State v. Timmendequas, 161 N.J. 515, 620 (1999)). Evidence of third-party guilt is admissible even

where it does not link another specific suspect to the crime, so long as it "tends to show that a person other than the defendant committed the crime." Ibid.

We are concerned with the investigating officers' failure to make reasonable efforts to secure and preserve the music studio surveillance footage. Even accepting Detective Rodriguez's testimony that the officers tried but were unable to download the footage, we note that the officers made no effort to record the video on their cell phones, cf. State v. Brown, 463 N.J. Super. 33, 53 (App. Div. 2020) (finding no adverse inference charge was needed where an officer preserved surveillance footage by recording it on his cell phone), nor did they prepare a report or take notes during their visit to the music studio. Although the record does not show that defendant made a timely preservation request for the studio surveillance footage, New Jersey's discovery principles do not permit investigators to dispose of potentially exculpatory evidence simply because they deem it immaterial.

We are hesitant, however, to construe Rule 3:13(b)(1) as imposing a duty on investigators to acquire and preserve material potentially destined for post-indictment disclosure. Unlike the cases relied upon by defendant in which this court found a discovery violation, detectives here never possessed the video footage. See, e.g., Richardson, 452 N.J. Super. at 142 (finding that where

prosecution "rested solely on the arresting officer's word," police destruction of a video showing the alleged discovery of drugs warranted an adverse inference instruction).

No one disputes that prosecutors have a duty to turn over to the defense not only exculpatory evidence, see Brady v. Maryland, 373 U.S. 83 (1963), but all relevant evidence, including but not limited to reports and exhibits that might be favorable to the defense.[12]  See also State v. Hogan, 144 N.J. 216 (1996) (explaining when prosecutors have a duty to present exculpatory evidence to a grand jury).

As our Supreme Court explained in the opening lines of State v. Hernandez, "New Jersey provides a broad range of discovery to an accused in a criminal case under Rule 3:13-3.  This open-file approach is intended to ensure fair and just trials."  225 N.J. 451, 453 (2016).  But this "open-file" approach

---

[12]  Rule 3:13-3(a), "Pre-Indictment Discovery," provides:

> Unless the defendant agrees to more limited discovery. where the prosecutor has made a pre-indictment plea offer, the prosecutor shall, at the time the plea offer is made, provide defense counsel with all available relevant material that would be discoverable at the time of indictment pursuant to paragraph (b)(1) of this rule.

We note that the Rule does not obligate the State to make disclosures where, as here, evidence is obtained pre-indictment without a plea offer.

applies to information and materials that are <u>in</u> the file, that is, materials that are in the possession of either police or prosecutors.[13]  Defendant cites no published authority for the proposition that police and prosecutors are required under our broad discovery rules to affirmatively seek out—and take possession of— physical or electronic evidence such as a surveillance video recording.  <u>Rule</u> 3:13, in other words, governs disclosure of information and evidence obtained during an investigation; it does not govern how to conduct investigations.  We are aware of no published precedent that requires prosecutors, for example, to issue a subpoena or apply for a search warrant or communications data warrant to obtain electronically recorded evidence relevant to an anticipated third-party guilt defense.  We decline on the present facts to create and retrospectively apply any such rule, especially since in this instance, the circumstances of the State's failure to obtain a copy of the music studio surveillance video were revealed to the jury through exhaustive and skillful cross examination and were highlighted by both defense counsel in summation.

---

[13]  <u>See</u> <u>State v. Washington</u>, 453 N.J. Super. 164, 184 (App. Div. 2018) (holding "a prosecutor's constitutional obligation to provide exculpatory information 'extends to documents of which it is actually or constructively aware, including documents held by other law enforcement personnel who are part of the prosecution team,' because they are 'acting on the government's behalf in the case.'") (first quoting <u>State v. Robertson</u>, 438 N.J. Super. 47, 69 (App. Div. 2014); and then quoting <u>Kyles v. Whitely</u>, 514 U.S. 419, 437 (1995)).

We recognize that "arguments of counsel can by no means serve as a substitute for instructions by the court." State v. Marshall, 123 N.J. 1, 145 (1991). However, "the prejudicial effect of an omitted instruction must be evaluated 'in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel.'" Ibid. (quoting Kentucky v. Whorton, 441 U.S. 786, 789 (1979)) (alteration in original) (emphasis added).

Counsel was able to put before the jury that police were biased in conducting the investigation of third-party guilt, bent on reinforcing and not undermining the prosecution of defendants, and thus did not make a concerted effort to secure evidence that would have allowed the jury to decide for itself whether the video supported an alibi for Hadjiedj. We note that, even when an adverse inference instruction is given, "[w]hether to draw such an inference falls within the jury's discretion, after it gives full consideration to the nature of the discovery violation, the explanation given by the State for the violation, and any other relevant factors that would bear on the issue." Dabas, 215 N.J. at 141.

We conclude that defense counsel's thorough cross-examination of the detectives coupled with summation arguments challenging the veracity and existence of the footage sufficiently "balance[d] the scales," id. at 140, and

allowed the jury to infer that the State failed to preserve the video because it was unfavorable to them. To borrow language from <u>Hernandez</u>, from a discovery perspective, the circumstances in this case satisfy the underlying intent of the "open-file approach," which is to "ensure fair and just trials." 225 N.J. at 453.

## B. Third-Party Guilt

We turn next to defendant's contention that he was denied a fair trial when the trial court failed to instruct the jury on the entire third-party guilt model charge, instead reading only portions of it. At a May 13, 2022, pre-trial hearing, defense counsel informed the court that defendants thought "third[-]party guilt [was] absolutely at issue in [the] case," and the court agreed that they would be permitted to explore that defense with the witnesses. During a May 25, 2022, charge conference, the parties discussed proposed jury instructions and neither defendant requested an instruction on third party guilt. Defendant contends that the court committed plain error by failing to sua sponte issue the model jury instruction on third party guilt.

"It is axiomatic that appropriate jury instructions are essential for a fair trial." <u>State v. Ball</u>, 268 N.J. Super. 72, 112 (App. Div. 1993). Where a defendant does not request an instruction or object to the lack of one, the trial

court's actions are reviewed under a plain error standard.  State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2; R. 1:8-7.  The defendant must demonstrate a legal impropriety in the charge that prejudiced substantial rights in such a "grievous" manner that "the error possessed a clear capacity to bring about an unjust result," State v. Hock, 54 N.J. 526, 538 (1969), meaning that the error "led the jury to a result it otherwise might not have reached."  State v. Jenkins, 178 N.J. 347, 361 (2004) (quoting State v. Brims, 168 N.J. 297, 306 (2001)).

While a third-party guilt instruction was appropriate here, the court's failure to issue the entire model third-party guilt charge was not plain error because the jurors were properly instructed as to their role in determining whether defendant or someone else committed the crime and that the State bore the burden to prove defendant did so beyond a reasonable doubt.  The court instructed the jury as follows:

> Each defendant, as part of his respective general denial of guilt, contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that he is the person who committed the alleged offenses.  The burden of proving the identity of the person or persons who committed the crime or crimes is upon the State.  For you to find a defendant guilty, the State must prove beyond a reasonable doubt that a defendant is the person who committed the crime or crimes.

A defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that a defendant is the person who committed it.

It further instructed, "If, after consideration of all the evidence, you determine that the State has not proven beyond a reasonable doubt that a defendant was the person . . . who committed the offense or offenses, then you must find that defendant not guilty."

Later, the court told the jury:

I have previously charged you with regard to the State's burden of proof which never shifts to a defendant. A defendant does not have to produce evidence that proves the guilt of another, but may rely on evidence that creates a reasonable doubt. In other words, there is no requirement that this evidence proves or even raises a strong probability that someone other than these defendants committed the crime or crimes. You must decide whether the State has proven a defendant's guilt beyond a reasonable doubt, not whether the other person or persons may have committed the crime.

After completing its instructions, the court asked whether any party had any issues with them; both defense counsel said no.

The model instruction on third party guilt that defendant argues was necessary reads as follows:

69

The defendant contends that there is evidence before you indicating that someone other than he or she may have committed the crime or crimes, and that evidence raises a reasonable doubt with respect to the defendant's guilt.

In this regard, I charge you that a defendant in a criminal case has the right to rely on any evidence produced at trial that has a rational tendency to raise a reasonable doubt with respect to his/her own guilt.

I have previously charged you with regard to the State's burden of proof, which never shifts to the defendant. The defendant does not have to produce evidence that proves the guilt of another, but may rely on evidence that creates a reasonable doubt. In other words, there is no requirement that this evidence proves or even raises a strong probability that someone other than the defendant committed the crime. You must decide whether the State has proven the defendant's guilt beyond a reasonable doubt, not whether the other person or persons may have committed the crime(s).

[Model Jury Charge (Criminal), "Third Party Guilt" (2015).]

The instructions given by the trial court here included the entire final paragraph of this model charge and informed the jury more than once that it was the State's burden to demonstrate beyond a reasonable doubt that defendants were the ones who committed the charged crimes. Although the instructions were missing a specific statement that defendants had raised third-party guilt as a defense, the jury was told that defendants could rely on any evidence that

might raise a reasonable doubt, and that this could include evidence that someone else committed the crimes. The jury was also told that such evidence did not need to be conclusive or even strong proof. At the time instructions were given, the jurors had heard arguments from both defense counsel that Torlao and Hadjiedj were the more likely suspects.

In these circumstances, the court's omission of the remainder of the model third-party guilt charge was not sufficiently "grievous" that it "possessed a clear capacity to bring about an unjust result." Hock, 54 N.J. at 538. The jury was well-aware that defendants had presented a theory of third-party guilt and was instructed repeatedly about the State's burden to show that defendants, not anyone else, were guilty beyond a reasonable doubt.

## VI.

We next address defendant's contention that the prosecutor committed misconduct during summation warranting reversal of his conviction. Defendant points to several statements made by the prosecutor that he asserts improperly influenced the jury and contributed to the guilty verdicts.

First, defendant argues that the prosecutor improperly stated that Torlao and Hadjiedj voluntarily appeared to testify, when in truth they were subpoenaed. The prosecutor argued:

71

Let me ask you this. [Hadjiedj] and Torlao; if you were them and you were responsible for this murder—which they are absolutely not—where's the last place on earth you would walk into? Right here. In the murder trial. In a trial of a murder that at some point the detectives thought you were involved in. I submit you would have to be dragged in, handcuffed, tied down, and pulled into this courtroom before volunteering to testify in the court.

Defendant asserts that this misstatement constituted improper vouching for these witnesses' credibility by suggesting that if Torlao and Hadjiedj committed the underlying crime, they would not have willingly appeared at trial.

While there was no objection during summation, defendants objected to the statements the following day. The trial court heard from all parties outside the presence of the jury and ultimately declined to give a curative instruction. The trial court determined that the statement was a passing comment, not repeatedly emphasized, and concluded that the instruction the jury had repeatedly received—that what an attorney says in their closing is not evidence—sufficiently cured any impropriety in the prosecutor's statement.

Next, defendant argues that the prosecution made improper inferences based on Avelino's lack of memory. During closing, the prosecutor stated that Avelino may have claimed that he did not remember the shooting or his statement to police "because he was in the room during a murder trial of the two

individuals that the State submits committed this murder." He continued, "How do you think [Avelino] feels sitting in this room? Did he look comfortable? Did he look like he wanted to be here? Of course not." He also remarked that Avelino left the courtroom "fast" after he was dismissed, saying, "Does that sound like someone who wants to be here or something else?"

Defendants objected, arguing that the prosecutor's comments insinuated that defendants intimidated Avelino and could have been charged with witness intimidation. Defendants asked for an appropriate jury instruction. The court, in response, instructed the jury that what an advocate says in summation is not evidence.[14]

Defendant raises additional arguments related to the prosecutor's closing for the first time on appeal. First, defendant argues that the prosecutor improperly stated that Reynoso was handling a gun inside his car at the gas station while replaying the relevant segment of the State's surveillance video

---

[14] The court instructed the jury as follows:

> What an attorney says in a closing argument is not evidence, it is their position as to what the evidence may show. You and you alone are the sole judges of the facts and the credibility of the witnesses and you are to determine what reasonable inferences, if any, may be drawn therefrom.

A-1533-22

compilation. Defendant argues that the prosecutor's comments were pure speculation rather than an appropriate inference from the evidence presented.

Defendant also asserts for the first time on appeal that the prosecutor committed misconduct by suggesting that not believing Detectives Flores and Rodriguez's testimony about the contents of the music studio surveillance video would be tantamount to accusing the police of engaging in a conspiracy. Defendant contends that this comment was not reasonably related to the evidence and undermined the sole defense at trial.

Finally, defendant argues that the prosecutor incorrectly stated that Avelino told police the shooters' vehicle's license plate began with a Z, when Avelino said it began with a Z or S.[15]

### A. Prosecutorial Misconduct

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented," and they are "expected to make vigorous and forceful closing arguments to juries." Frost, 158 N.J. at 82. "[A]s long as the prosecutor 'stays

---

[15] Reynoso argues for the first time on appeal that the prosecutor improperly vouched for Flores and Rodriguez's honesty by referring to their "decades of experience." This argument was not raised by defendant and we do not address it. Generally, issues not raised below will not be considered on appeal. State v. Walker, 385 N.J. Super. 388, 410 (App. Div. 2006).

within the evidence and the legitimate inferences therefrom,'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. R.B., 183 N.J. 308, 330 (2005)), "[t]here is no error." Ibid. (quoting State v. Carter, 91 N.J. 86, 125 (1982)). However, "'references to matters extraneous to the evidence' may constitute prosecutorial misconduct." State v. Williams, 244 N.J. 592, 607 (2021) (quoting State v. Jackson, 211 N.J. 394, 408 (2012)).

Even if a prosecutor's remarks exceed the bounds of permissible commentary, our review does not end there; "[r]ather, we must weigh 'the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial.'" Id. at 608 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).

Where a defendant fails to object to a prosecutor's statement when it was made, any asserted error must be evaluated for plain error. State v. Tilghman, 345 N.J. Super. 571, 575 (App. Div. 2001); R. 2:10-2. We glean from the relevant jurisprudence that, in this context, whether framed as harmless or plain error, we must conclude that the error was harmless beyond a reasonable doubt. See State v. Butler,__ N.J. __, __ (2026) (slip op. at 19-20) (explaining that reversal is warranted under the plain error standard where "an error [is] sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached" and describing harmless error

75

analysis as "whether the error was <u>sufficient to raise a reasonable doubt</u> as to whether the jury would have reached a different conclusion absent the error.") (emphasis added) (internal citations omitted). To warrant reversal, moreover, the "misconduct must have deprived the defendant of a fair trial." <u>State v. Hawk</u>, 327 N.J. Super. 276, 281 (App. Div. 2000). The prosecutor's conduct must have been "so egregious," <u>State v. Ramseur</u>, 106 N.J. 123, 322 (1987), that it "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." <u>Timmendequas</u>, 161 N.J. at 575.

We "assess the prosecutor's comments in the context of the entire trial record." <u>Nelson</u>, 173 N.J. at 472. Reviewing courts consider the overall "'tenor of the trial,'" <u>Frost</u>, 158 N.J. at 83, the nature of the alleged error, the responses of counsel and the trial court, and any resulting prejudice. <u>Williams</u>, 244 N.J. at 608. Furthermore, statements by a prosecutor that would otherwise be prejudicial "may be deemed harmless if made in response to defense arguments." <u>State v. McGuire</u>, 419 N.J. Super. 88, 145 (App. Div. 2011). Likewise, where a prosecutor's comments are "only slightly improper," a general jury charge to the effect that statements during summation are not evidence and should be disregarded if they conflict with jurors' recollection of events "may serve to

ameliorate potential prejudice." Frost, 158 N.J. at 86-87; Ramseur, 106 N.J. at 323.

B. Prosecutor's Statements That Were Objected to

We begin by addressing the prosecutor's statements that were objected to at trial. First, we address whether the prosecutor's statements during summation that Torlao and Hadjiedj appeared voluntarily were improper. A prosecutor "may argue that a witness is credible," but may not express a "personal belief" in the witness's truthfulness or "state[] or impl[y] that the jury can accept the witness's credibility based upon information outside the trial evidence." State v. Walden, 370 N.J. Super. 549, 560-61 (App. Div. 2004). Even if a prosecutor commits impropriety by stating that a witness was truthful, a reversal may not be warranted if a witness's credibility was highly contested at trial and the jury was exposed to both sides of the argument through cross-examination. See Marshall, 123 N.J. at 156-57.

We find that the prosecutor's comments regarding Torlao and Hadjiedj were not an improper expression of his personal belief regarding those witnesses' credibility. The prosecutor's use of the phrase "I submit to you" signals to the jury that counsel is offering an interpretation of what the evidence shows, rather than asserting a new fact into evidence. For the sake of argument,

even if we were to conclude that the statement was improper, reversal is unwarranted because Torlao and Hadjiedj's credibility was thoroughly contested at trial and the jury had a full opportunity to examine the witnesses' reliability through cross-examination and defense arguments. See ibid.

We next turn to the prosecutor's comments insinuating that Avelino's lack of memory was a result of intimidation by the defendants. We do not find the prosecutor's statements regarding Avelino to be improper because they represented inferences that the jury could draw from Avelino's behavior and demeanor during his testimony. The prosecutor's comments did not stray so far as to suggest that he possessed evidence or knowledge beyond what was revealed to the jury during Avelino's testimony. See State v. Feaster, 156 N.J. 1, 59 (1998) (finding "[a] prosecutor is guilty of misconduct if he implies to the jury that he possesses knowledge beyond that contained in the evidence presented, or if he reveals that knowledge to the jury"). Moreover, that a witness would be fearful to testify at a trial for a drive-by shooting is a fair inference to draw given the nature of the offense.

### C. Summation Arguments Not Raised Below

Next, we address defendant's contentions regarding the prosecutor's closing arguments that are raised for the first time on appeal. Because defendant

A-1533-22

did not object to the following summation remarks at trial, we review them for plain error. See Timmendequas, 161 N.J. at 576; R. 2:10-2. We reiterate that "the failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made . . . [and] deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 84.

We begin with defendant's argument that the prosecutor improperly stated that Reynoso was handling a gun inside his car at the gas station while replaying the relevant segment of the State's surveillance video compilation. The prosecutor argued:

> Ladies and gentlemen, I submit to you right now, as this is happening, that Defendant Reynoso is sitting in this vehicle, he had something in his hand. I submit to you that I want you to look at the way his hand is positioned, and you determine whether or not my submission to you that that is a gun is accurate.
>
> . . . .
>
> Ladies and gentlemen, I want you to focus on Defendant Reynoso's left hand. It's going to happen quick.
>
> See he's opening his hand? See that little shine? What can shine in light? I'm going to show it to you one more time. See it? I submit to you it could be a shell casing. It could be a bullet. I submit to you that it is exactly that, that you're seeing in this video.

The Supreme Court's conclusions in Feaster and McNeil-Thomas are instructive here. In Feaster, the State's case was based almost entirely on inculpatory statements made by defendant following the murder of a gas station attendant. 156 N.J. at 56. The State relied on defendant's later descriptions of the murder to demonstrate the timeline of events. Ibid. The prosecutor then "sought to provide some of the missing pieces" during summation, stating that defendant loaded his gun and cocked the weapon's hammer on the ride to the gas station, and that defendant approached the gas station "from the blind side" and "shoulder[ed] into the door." Id. at 56-58. The Court found the prosecutor's statements inappropriate considering there was no evidence presented at trial from which such inferences could be drawn. Id. at 62-63.

The Court reached a different conclusion in McNeil-Thomas, where the prosecutor utilized a five-second video surveillance clip to suggest to the jury that the defendant, while following his stepfather's pickup truck in a black Cadillac CTS, drove by the restaurant where the shooting later occurred to confirm that his intended targets were there. 238 N.J. at 270. The Court concluded that the prosecutor's statements were "fair comment on the evidence." Id. at 280-81. The Court explained that the prosecutor properly invited the jury to draw reasonable inferences from the available evidence, including testimony

of the defendant's neighbor, who stated that defendant returned home in a black sedan "like a Cadillac" on the night of the shooting. Id. at 277. Moreover, police photographs and video depicting the pickup truck and the black sedan were all admitted into evidence and were part of the record. Id. at 280-81. The Court determined that the prosecutor's comments during summation "were reasonable and fair inferences supported by the evidence presented at trial." Id. at 261.

Unlike the prosecutor in Feaster whose summation arguments had no basis in the record, the prosecutor here invited the jury to draw a reasonable inference from the State's surveillance compilation footage. The prosecutor's comments are more akin to those in McNeil-Thomas, representing fair commentary on the evidence. Id. at 280-81. The prosecutor invited the jury to draw an inference concerning what was depicted in the surveillance compilation video. We also note that the prosecutor again repeatedly employed language like "I submit," signaling to the jury that the prosecutor's commentary was not fact but represented an opinion about what could be inferred from the evidence. There is a clear inference to be drawn that if defendants were in a car from which bullets were fired, at least one of them possessed a gun.

We reiterate that the jury was instructed that what an attorney says in a closing argument is not evidence, and that the jurors are the sole judges of the

A-1533-22

facts and what reasonable inferences, if any, may be drawn from those facts. Ultimately, it was for the jury to decide whether there was a flash of light depicted on the surveillance compilation video and what might have caused any such flash. Thus, we conclude that the prosecutor "sought to connect interrelated pieces" and did not impermissibly seek "to provide some of the missing pieces." McNeil-Thomas, 238 N.J. at 279-80 (quoting Feaster, 156 N.J. at 56).

We next consider defendant's contention, raised for the first time on appeal, that the prosecutor committed misconduct by suggesting that not believing Detectives Flores and Rodriguez's testimony about the contents of the music studio surveillance video would be equivalent to accusing the police of engaging in a conspiracy.

The prosecutor made the following statement:

> Detective Rodriguez went to the studios, watched the video. Detective Flores watched the video. They both said three to four hours. He was sitting, smoking, drinking, watching, and listening to music. [Rodriguez] said it, Flores said it, and then [Hadjiedj] said it.
>
> The Defense wants you to believe that this is a lie. . . .
>
> And if that's the case, then Detective Flores, Detective Rodriguez—both detectives of the Passaic Police for upwards of 20 years—Mehdi Hadjiedj, a 25-year-old

from Jersey City, and the [music] [s]tudio in Clifton were all in a conspiracy to fabricate that [Hadjiedj] was there.

We are not convinced the prosecutor's comments amount to personally vouching for the witnesses' credibility. See Walden, 370 N.J. Super. at 560 ("A prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility"). Nor did the comments imply that the witnesses' testimony was more credible simply because of their status as police officers. See State v. Staples, 263 N.J. Super. 602, 606 (App. Div. 1993) ("[I]t is 'obviously improper' to imply that police testimony should be accepted, 'not because of its believability but because the witnesses were policemen.'" (quoting State v. Jones, 104 N.J. Super. 57, 65 (App. Div. 1968))). Rather, these comments were in response to defendant's argument attacking the veracity of the surveillance footage and questioning its existence. State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993) ("Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless."). We conclude that the commentary was not improper. Again, we are mindful that the absence of an objection "suggests that defense counsel did not believe the remarks were prejudicial at the time they were made," especially considering defense counsel

knew to object and did so with respect to other comments made by the prosecutor. Frost, 158 N.J. at 84.

Finally, we address defendant's argument that the prosecutor improperly stated that Avelino told police that the shooters' license plate began with a "Z," when Avelino said it began with a "Z" or "S." Defendant argues that this alleged error was exacerbated by the prosecutor comparing Hadjiedj's father's plate to the shooter's plate.

We conclude that there was no impropriety in the prosecutor's statements because they were well within the scope of evidence presented. See McNeil-Thomas, 238 N.J. at 275. The jury watched the video of Avelino's interview with Detective Merced where he stated that it was a "Z" or an "S" on the shooter's plate. The jury also heard the defense in closing reference Avelino's comment more than once that the plate contained a "Z" or an "S." The prosecutor's comments that the shooter's plate bore certain letters was a reasonable inference permissibly drawn from the State's surveillance compilation video, placing that car in proximity to the scene of the crime before and after the shooting.

In sum, we conclude that the prosecutor's remarks remained within the bounds of fair commentary on the evidence presented. We are reminded of

Justice Clifford's comments, dissenting in State v. DiPaglia, 64 N.J. 288, 305 (1974):

> Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.

Even assuming, for the sake of argument, that the above comments were improper, we reiterate that they were sufficiently ameliorated by the trial court's instruction that what an attorney says in a closing argument is not evidence and that jurors, as the sole judges of the facts and the credibility of the witnesses, are to determine what reasonable inferences may be drawn from the evidence presented. We presume that the jury adhered to the court's instruction. State v. Muhammad, 145 N.J. 23, 52 (1996). At bottom, reversal is unwarranted because we cannot say that any of the alleged errors were "'sufficient to raise a reasonable doubt as to whether the' jury would have reached a different conclusion." Butler, ___ N.J. at ___ (slip op. at 19-20).

## VII.

Defendant next argues that the trial court erred in denying his motion for judgment of acquittal and motion for a new trial because the jury verdict was not rationally based in the evidence. Specifically, defendant contends that his

convictions must be reversed because no eyewitness identified him as the driver or gunman, no testimony established that he or Reynoso possessed a gun, no evidence linked them to the victims or established motive, and neither defendant confessed to police. He further contends that the State failed to prove he owned the Nissan seen on the surveillance footage near the scene, and the only evidence that Reynoso was handling a gun at the gas station was the detectives' "problematic opinions." Accordingly, he asserts, the jury "could only have found [him] guilty by conjecture or speculation."

In support of his contentions, defendant also points to a letter sent by an alternate juror who was not part of the final verdict asserting that if this juror had been selected to deliberate, "he would have certainly said that there was insufficient evidence to convict [defendant]," and that this was "one of the reasons" a new trial was necessary.[16]

---

[16] The letter was not read into the record, but counsel stated that the juror opined that he did not believe the bullets that hit the victims could have come from the window of the car on the surveillance video because of its height, and that he thought the shots were instead fired from a "truck that was located on that street at the time." It may be noted that no such argument was raised by either defendant during trial. The judge found that the letter sent by the alternate juror was "wholly irrelevant" and without bearing on her decision, because there had been "no testimony as to the . . . height of the car and the white truck" and because this juror "was not part of the final deliberating jury who ultimately rendered a verdict."

A-1533-22

"In reviewing the grant or denial of a motion for a judgment of acquittal, we apply the same standard as the trial court." State v. Fuqua, 234 N.J. 583, 590 (2018). See also State v. Williams, 218 N.J. 576, 593-94 (2014) ("In assessing the sufficiency of the evidence on an acquittal motion, we apply a de novo standard of review"). Our Supreme Court, reiterating the appropriate standard, explained,

> We will deny a motion for a judgment of acquittal if "the evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt."
>
> [Fuqua, 234 N.J.at 590-91 (quoting State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974)).]

The burden is upon the defendant to show that the evidence did not support the jury's verdict. State v. Papasavvas, 170 N.J. 462, 479 (2002).

A defendant may also move for a new trial under Rule 3:20-1, which the court may grant "if required in the interests of justice." The trial judge "shall not . . . set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a

manifest denial of justice under the law." Ibid. The decision whether to grant a new trial "is left to the trial judge's sound discretion," and an appellate court "should interfere with the exercise of that discretion only when 'a clear abuse has been shown.'" State v. Van Ness, 450 N.J. Super. 470, 495-96 (App. Div. 2017) (quoting State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004)).

Appellate review of the denial of a motion for a new trial is thus limited to evaluating whether the trial court "could reasonably have reached the findings it made based on 'sufficient credible evidence . . . in the record.'" Ibid. (quoting Brooks, 366 N.J. Super. at 447). An appellate court should defer to "the trial judge's 'feel for the case' because he or she had the opportunity to 'observe and hear the witnesses as they testified.'" Ibid. (quoting Brooks, 366 N.J. Super. at 447).

Viewing the evidence in the light most favorable to the State, we conclude that the trial court did not err in denying defendant's motions for acquittal or for a new trial. There was sufficient circumstantial evidence linking defendant to the shooting. First, his car matched the basic description given by multiple eyewitnesses and bore a license plate beginning with "Z"—one of the letters Avelino reported to police. Second, surveillance video showed defendant getting into this car on Howe Avenue, exiting it at the Main Avenue gas station,

and getting back in shortly thereafter. Third, further surveillance footage showed a car driving in the vicinity of Federal Street just before and just after the shooting, traveling around the block at least twice as reported by eyewitnesses to the incident.

Importantly, the jury was able to view these videos and determine whether the man they saw on the screen was defendant. It was also able to decide whether the car depicted near Federal Street was the one seen at the gas station and on Howe Avenue. The reasonable inferences to be drawn from the evidence are that the cars were indeed the same, and that defendant was the driver. Accordingly, there was sufficient circumstantial evidence to defeat a motion to acquit under Rule 3:18-2 or a motion for a new trial under Rule 3:20-1.

Furthermore, although defendant argues on appeal that there was no testimony directly stating that he or Reynoso possessed a gun, it is reasonable to infer that the car shown in the area of Federal Street was the one involved in the shooting, as no mention was made at trial by any party of any other vehicle moving through the vicinity at that time or making the same multiple passes down the street. Likewise, there is no real dispute that Castillo and Cabrera suffered gunshot wounds, and shell casings were recovered from the scene. Accordingly, the clear inference to be drawn is that if defendants were in a car

from which bullets were fired, at least one of them possessed a gun. The State was not required to offer the gun into evidence for a jury to find that defendants used and possessed a gun. See State v. Little, 246 N.J. 402, 418-19 (2021) ("To meet its burden to prove that defendant unlawfully possessed a handgun, the State was not required to offer into evidence the weapon that it alleged was possessed by defendant.").

Finally, the State did not need to establish that defendants had a motive to harm the victims to meet its burden to prove all the elements of the charged crimes, as motive is not an element. See N.J.S.A. 2C:11-3; N.J.S.A. 2C:5-1; N.J.S.A. 2C:5-2; N.J.S.A. 2C:39-4(a); N.J.S.A. 2C:39-5(b) (setting forth each of the crimes for which defendant was charged). See also State v. Moore, 158 N.J. Super. 68, 88 (App. Div. 1978) ("We should not, however, confuse intent with motive. Proof of motive is never essential to a conviction but may be evidential.") (quoting Morss v. Forbes, 24 N.J. 341, 359 (1957)). The State was not required to show that defendants bore any particular animus toward Castillo, Cabrera, or anyone else in the group at the Federal Street residence.

## VIII.

We turn to defendant's final contention on appeal that resentencing is required. Defendant argues that the trial court failed to provide a statement on

overall fairness in accordance with Torres, 246 N.J. 246, nor did it consider defendant's age when imposing consecutive sentences. Defendant asserts that concurrent sentences would have been more appropriate because the wounding of Cabrera and the killing of Castillo occurred close in time as part of a single period of behavior. Defendant further argues that it was improper for the court to apply aggravating factor three, "[t]he risk that the defendant will commit another offense," based on his admitted substance abuse issues. N.J.S.A. 2C:44-1(a)(3). Finally, he argues that the court should have found mitigating factor six, that the defendant "has compensated or will compensate the victim of the defendant's conduct for the damage or injury that the victim sustained," because it imposed $5,000 in restitution, and mitigating factor fourteen, that the defendant "was under 26 years of age at the time of the commission of the offense," because he was twenty-four at the time of the shooting. N.J.S.A. 2C:44-1(b)(6) and (14).

"Appellate review of a criminal sentence is limited; a reviewing court decides whether there is a 'clear showing of abuse of discretion.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)). A trial court enjoys "considerable discretion in sentencing." State v. Blann, 429 N.J. Super. 220, 226 (App. Div. 2013), rev'd on other grounds, 217

91

N.J. 517 (2014). An appellate court first must review whether the sentencing court followed the applicable sentencing guidelines set forth in the Code of Criminal Justice. State v. Natale, 184 N.J. 458, 489 (2005); State v. Case, 220 N.J. 49, 63 (2014).

Defendant was sentenced to forty years imprisonment with an eighty-five percent period of parole ineligibility for murder, a consecutive term of fifteen years with an eighty-five percent period of parole ineligibility for first-degree attempted murder, and a concurrent term of nine years with a four-and-a-half-year period of parole ineligibility for second-degree unlawful possession of a weapon. The remaining charges were merged with these counts.

N.J.S.A. 2C:11-3(b)(1) provides that a person convicted of murder shall be sentenced to a term of thirty years without parole or to "a specific term of years" between thirty years and life imprisonment, with a thirty-year period of parole ineligibility. NERA further provides that a court shall impose an eighty-five percent period of parole ineligibility where a person is convicted of murder or attempted murder. N.J.S.A. 2C:43-7.2. N.J.S.A. 2C:43-6(a)(1) and (a)(2) dictate that a sentence for a first-degree crime must be between ten and twenty years and a sentence for a second-degree offense be between five and ten years, respectively. Defendant's sentence fell within the permissible range.

## A. Aggravating and Mitigating Factors

Next, we must ensure that any aggravating or mitigating factors found by the trial judge under N.J.S.A. 2C:44-1 are based upon sufficient credible evidence in the record. State v. Miller, 205 N.J. 109, 127 (2011). If the factors found by the trial court are so grounded, the sentence must be affirmed even if the reviewing court would have reached another result. State v. O'Donnell, 117 N.J. 210, 215 (1989).

Whether a sentence will "gravitate toward the upper or lower end of the [statutory] range depends on a balancing of the relevant factors." Case, 220 N.J. at 64. A court "must qualitatively assess" the factors it finds and assign each an "appropriate weight." Id. at 65. The sentencing judge must explain its findings about each factor presented by the parties and how the factors were balanced to arrive at the sentence. Id. at 66.

Here, the trial court found aggravating factors three, "[t]he risk that the defendant will commit another offense," six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted," and nine, "[t]he need for deterring the defendant and others from violating the law." N.J.S.A. 2C:44-1(a)(3), (a)(6), and (a)(9). Its finding of factor six was based upon defendant's prior convictions and juvenile

adjudications for drug-related offenses, aggravated assault on a corrections employee, harassment, and theft. The court gave "some weight" to factor three, "heavy weight" to factor six, and "substantial weight" to factor nine.

As to defendant's drug use, the court noted that defendant had admitted that "in the past" he "used alcohol occasionally" and used Percocet and Xanax "daily" when he was age twenty-three to twenty-four. He had not received any prior substance abuse or mental health treatment.

As to aggravating factor three, the court stated that there was "credible evidence" to support it "due to [his] admitted substance abuse issues" involving prescription medications. The trial court stated that the current offenses "involve[d] violence against another," and that defendant's prior criminal record also involved "violent acts even while in an institutionalized setting." The court determined that this demonstrated an "inability to appropriately temper his behavior," stating that his history of violence "as well as his substance abuse issues," left him "at a risk to reoffend."

The court found but gave minimal weight to mitigating factor nine, "[t]he character and attitude of the defendant indicate that the defendant is unlikely to commit another offense," N.J.S.A. 2C:44-1(b)(9) "mainly based upon" defendant's "respectful" conduct during the proceedings and good behavior

94

while incarcerated.  It also found mitigating factor fourteen, "[t]he defendant was under 26 years of age at the time of the commission of the offense," N.J.S.A. 2C:44-1(b)(14), based on defendant's age at the time of the shooting and gave it "the most weight as to the mitigating factors."  It concluded that the "qualitative weight" of the aggravating factors outweighed the mitigating factors.

First, we hold that there was no error in the court's imposition of aggravating factor three.  The finding of this factor was not based solely upon defendant's drug use, but on his criminal record, which involved violent offenses—specifically, committing assault while in custody for an earlier offense.  This is significant evidence of risk for reoffending, considering imprisonment did not curtail the behavior.  Further, a sentencing court may find aggravating factor three based upon a defendant's substance abuse.  State v. Bieniek, 200 N.J. 601, 610 (2010); State v. Amer, 471 N.J. Super. 331, 358 (App. Div. 2022); State v. Towey, 244 N.J. Super. 582, 594-95 (App. Div. 1990) (upholding a finding of aggravating factor three where the defendant's history of drug use was part of the analysis).  Given that defendant was illegally using drugs, his behavior was properly considered as evidence that he could engage in further criminal behavior in the future.

95

We likewise conclude there was no error in the court's failure to sua sponte find mitigating factor six. After pronouncing its sentence for murder, the court required defendants to pay restitution jointly and severally to the Victims of Crime Compensation Board in the amount of $5,000 pursuant to N.J.S.A. 2C:44-2(c)(2).

An order of restitution is mandatory for a murder conviction pursuant to N.J.S.A. 2C:11-3. To require a finding of mitigating factor six solely because a court has imposed such an order upon a person convicted of murder would result in every such person receiving the benefit of that factor. Further, following the court's sentencing decision, defendant argued that it would be difficult if not impossible for him to pay the restitution imposed. Considering defendant sought to be absolved of paying restitution, the court's ordering of restitution did not warrant a finding of mitigating factor six.

B. Consecutive Sentences and Overall Fairness Under Torres

N.J.S.A. 2C:44-5(a) provides that when multiple sentences are imposed, these sentences "shall run concurrently or consecutively as the court determines at the time of sentence." There is "no overall outer limit on the cumulation of consecutive sentences for multiple offenses." Ibid. "[T]here is no presumption in favor of concurrent sentences and therefore the maximum potential sentence

authorized by the jury verdict is the aggregate of sentences for multiple convictions." State v. Abdullah, 184 N.J. 497, 513-14 (2005).

State v. Yarbough requires that the following criteria must be considered "when sentence is pronounced on one occasion on an offender who has engaged in a pattern of behavior constituting a series of separate offenses or committed multiple offenses in separate, unrelated episodes:"

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence shall be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous.

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.

[100 N.J. 627, 643-44 (1985), holding modified by Torres, 246 N.J. 246.]

The "no free crimes" guideline stated in Yarbough factor one "does not require the court automatically to impose consecutive sentences for multiple offenses." State v. Rogers, 124 N.J. 113, 121 (1991). Instead, the sentencing court must consider all the Yarbough guidelines, with emphasis on the subparts of the third. Id. at 121. The criteria must be applied qualitatively, not quantitatively, and consecutive sentences may be imposed even if most of the subparts support concurrent sentences. State v. Carey, 168 N.J. 413, 427-28 (2001).

If a sentencing court fully evaluates the Yarbough factors, its decision usually will not be disturbed. Miller, 205 N.J. at 129. However, remand may be needed if a court does not sufficiently explain why consecutive sentences are

warranted. Id. at 129-30; Carey, 168 N.J. at 424. Additionally, "the sentencing court's explanation of its evaluation of the fairness of the overall sentence is 'a necessary feature in any Yarbough analysis.'" Torres, 246 N.J. at 270 (quoting State v. Cuff, 239 N.J. 321, 352 (2019)). Nevertheless, remand is unnecessary if the record "makes it possible to 'readily deduce' the judge's reasoning." Miller, 205 N.J. at 129 (quoting Bieniek, 200 N.J. at 609).

When sentencing defendant, the trial court concluded that although the crimes occurred "at the same time and place," "multiple gunshots" were fired resulting "in different harm to the [two] victims." The court stated that defendant "should not receive the benefit of" a "free crime," particularly since murder and attempted murder are both "crimes of violence." The trial court thus determined that the sentences for these crimes would run consecutively, based on its "qualitative[] review[]" of the Yarbough factors, considering "proportionality and fairness in sentencing and overall fairness in the aggregate sentence."

We find no error in the trial court's analysis of the Yarbough factors. Our jurisprudence supports the imposition of consecutive sentences where, as here, there are multiple victims harmed close in time. See, e.g., State v. Roach, 146 N.J. 208, 230-31 (1996) (upholding consecutive sentences for two counts of

felony murder committed "in close sequence," because "the deaths of the two victims were separate acts of violence"). The trial court fully set forth its reasoning for imposing consecutive sentences on the record. Miller, 205 N.J. at 129.

As for the overall fairness of the sentence imposed, the trial court considered the "fundamental fairness" of defendants' sentences, as well as "proportionality," when evaluating the Yarbough factors. The trial court discussed the reasons supporting its findings, including defendants' prior and subsequent convictions, the nature of the offenses and the harm to each victim, and the intended "deterrent value" of the sentence upon both defendants and the public. Although the trial court did not explicitly reference Torres, we can "readily deduce" and evaluate the trial court's reasoning. Miller, 205 N.J. at 129. The trial court's detailed consideration of the aggravating and mitigating factors, as well the Yarbough analysis, were sufficient to satisfy Torres. We therefore affirm defendant's sentence.

To the extent we have not specifically addressed them, or have addressed them only briefly, any remaining arguments raised by defendant lack sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1533-22